# Exhibit A

# The New York Times

right © 2001 The New York Times                SUNDAY, JUNE 16, 2002

## The Bad Old Days at the F.B.I.

Clark Kerr, who was president of the University of California from 1958 to 1967, had a witty send-off when the state's board of regents — upset by the rising tide of protests on campus — removed him from office. He was leaving as he came, he declared, "fired with enthusiasm!" What Mr. Kerr did not know at the time was that he was also fired, at least in part, by the Federal Bureau of Investigation.

According to newly released documents, the F.B.I. waged a defamation campaign against Mr. Kerr, whom J. Edgar Hoover, the F.B.I. director, regarded as too liberal, passing on false information about him to conservative regents. The F.B.I. also spied on Berkeley faculty members, staff and students whose politics it despised. And it sabotaged Mr. Kerr's attempt to join the Johnson administration.

These revelations, first reported this month in The San Francisco Chronicle, came to light as a result of a 17-year campaign by a reporter there to obtain the records under the Freedom of Information Act. The documents provide disturbing new details of the F.B.I.'s abuse of power in the 1960's, and they are a cautionary tale for today, as the Bush administration aggressively expands the role of domestic intelligence operations.

The F.B.I. was drawn into University of California politics, remarkably, by a question on a 1959 English aptitude test. It asked high school students applying to the university what the dangers were to a democracy when a "national police organization, like the F.B.I., . . . operates secretly and is unresponsive to public criticism." Mr. Hoover was enraged and engaged in a covert campaign to make the university repudiate the question. Under pressure

from Gov. Edmund G. (Pat) Brown, the school retracted the question and professed its "highest respect" for the F.B.I.

Throughout the 1960's, according to The Chronicle, the F.B.I. investigated not only students active in Berkeley's Free Speech Movement, but also their family members, a CBS reporter who covered them and a company that produced an album of Free Speech Movement Christmas carols. It also prepared a 60-page report on the school's political makeup, including a list of faculty whose politics the bureau found questionable, who were to be detained in case of a national emergency, without a judicial warrant.

Among the faculty members under F.B.I. watch were 54 professors whose families subscribed or contributed, in the bureau's view, to "subversive publications," and others who were involved in "illicit love affairs, homosexuality, sexual perversion, excessive drinking or other instances of conduct reflecting mental instability." The records also detail how the F.B.I., when called on to conduct a routine background check on Mr. Kerr in 1964 to clear him to be appointed secretary of Health, Education and Welfare, falsely portrayed him as "pro-Communist." President Lyndon Johnson ultimately decided not to appoint Mr. Kerr to the post.

The documents should be required reading for the Bush administration and Congress as they consider how to reconfigure domestic intelligence. These accounts of the F.B.I.'s malfeasance are a powerful reminder of how easily intelligence organizations deployed to protect freedom can become its worst enemy.

See The Campus Files Story – and once secret FBI records - at:
www.sfgate.com/campus



**SFGate.com**

**Quick Search**

[ GO ]

Advanced Search

▸SFGate Home
▸Today's Chronicle

▸Sports
▸Business
▸Entertainment
▸Food&Dining
▸Travel

**News & Features**
▸Opinion
▸Politics
▸Technology
▸Crime
▸Science
▸Cars
▸Small Business
▸Weird News
▸Polls
▸Photo Gallery
▸Video Reports
▸Audio Slideshows
▸Columnists
▸Travel
▸Lottery
▸Obituaries
▸Blogs

**Community Blogs**
By our readers for
our readers  **BETA**

▸Newspaper Ads

**Classifieds**
▸Jobs
▸Personals
▸Real Estate
▸Rentals
▸Cars

**Regional**
▸Traffic
▸Weather
▸Live Views
▸Maps
▸Bay Area Traveler
▸Wine Country
▸Reno & Tahoe
▸Ski & Snow
▸Outdoors
▸Earthquakes
▸Education
▸Chronicle Watch
▸Public Notices

**Entertainment**
▸Food & Dining
▸Wine
▸96 Hours
▸Movies
▸Music & Nightlife
▸Events
▸Performance
▸Art
▸Books
▸Comics
▸TV & Radio
▸Search Listings

**the campus files**    A Chronicle Special Report

## Reagan, Hoover and the UC Red Scare

Seth Rosenfeld, Chronicle Staff Writer

Sunday, June 9, 2002

**San Francisco Chronicle**

**Campus Files Home**

1. Introduction
2. FBI's Secret UC files
3. Trouble On Campus
4. Governor's Race
5. The Legacy -- Epilogue
6. The 17-Year Legal Battle
7. Where Are They Now?
• A Note On Sources

The FBI Files
• Censored and
  uncensored docs

Timeline
• 1945-1960
• 1961-1965
• 1966-1973

Galleries
• Decade of Student Protest
• An Era of Secrecy

On the gray Monday morning of Jan. 16, 1967, two senior FBI agents were ushered into the governor's Victorian mansion in Sacramento, then led up to a second-floor suite, where a flu-stricken Ronald Reagan was propped up in a bed piled with working papers.

Gov. Reagan had just been elected after campaigning to restore order at UC Berkeley, where "beatniks, radicals and filthy speech advocates" were proof of what he called the "morality and decency gap in Sacramento." Now he was "damned mad" at campus officials, one agent recalled, and he was asking the FBI to tell him "what he was up against."

Back in Washington, D.C., FBI Director J. Edgar Hoover saw Reagan's request for confidential information as a chance to finally quell the protests at Berkeley, which were sparking demonstrations at schools across the country.

"This presents the bureau with an opportunity to . . . thwart the ever increasing agitation by subversive elements on the campuses," he noted in a memo.

Hoover had long been concerned about the University of California, the nation's largest public university and operator of top-secret federal nuclear laboratories. In 1960, he warned Congress of an international communist conspiracy plotting to "control for its own evil purposes the explosive force which youth represents."

But as the Cold War waned, the FBI departed from its mission of protecting national security and engaged in sprawling covert intelligence operations that involved thousands of UC students and faculty participating in legitimate debate about public policy.

For years the FBI has denied engaging in such activities at the university. But a 17-year legal challenge brought by a Chronicle reporter under the Freedom of Information Act forced the FBI to release more than 200,000 pages of confidential records covering the 1940s to the 1970s.

Those documents describe the sweeping nature of the FBI's activities and show they ranged far beyond the campus and into state politics.

The FBI records -- in addition to other official papers and scores of interviews with current and former FBI agents and university officials -- reveal that the FBI:

- conspired with the head of the CIA and a senior member of the university's Board of Regents to pressure the board to "harass" faculty and students involved in protests,
- misled the White House by sending the president information the bureau knew to be false,
- and mounted covert public relations efforts to manipulate public opinion about campus events and embarrass university officials.

Along the way, the FBI campaigned to destroy the career of UC President Clark Kerr -- even though the bureau's own investigations repeatedly found him to be loyal.

At the same time, the FBI forged a close relationship with Reagan -- a

**Living**
▸Health
▸Home & Garden
▸Gay & Lesbian
▸Horoscope

**Resources**
▸RSS Feeds
▸My Feeds
▸Search & Archives
▸Feedback/Contacts
▸Corrections
▸Newsletters
▸Promotions
▸Site Index

**Advertising**
▸Advertise Online
▸Advertise in Print
▸Place a Classified
▸SF Gate Media Kit

**Newspaper**
▸Advertise
▸Chronicle
  In Education
▸Contacts
▸Chronicle Events
▸FAQ
▸Jobs at
  the Chronicle
▸Submissions

**Subscriber
Service**
▸Get Home Delivery
▸Manage Account,
  Missed Delivery,
  Vacation Hold

more aggressive informer than previously disclosed -- catalyzing his transformation from liberal movie star to the staunch conservative who became one of the 20th century's most powerful figures.

The office of Ronald Reagan declined to comment and referred questions to former U.S. Attorney General Edwin Meese III.

Meese, who was Gov. Reagan's chief of staff, said Reagan had a "longtime relationship with the bureau" and that the FBI's assistance to the governor in handling campus unrest was "strictly appropriate and lawful." Meese said that, to his knowledge, the FBI did not give political assistance to Reagan.

Bill Carter, an FBI spokesman in Washington, D.C., declined to comment on the bureau's campus files. "Things are done a lot differently today," he said, adding, "The files speak for themselves."

Cartha "Deke" DeLoach, who was Hoover's third in command, said the FBI gave Reagan no special help and responded properly to domestic unrest that posed a "considerable threat to the country."

In court papers, the bureau has maintained that its activities were lawful and intended to protect civil order and national security.

But in ordering the release of the FBI's files in 1995, a federal appeals court concluded that some of the bureau's activities extended far beyond its law enforcement mandate and "came to focus on political rather than law enforcement aims."

And as U.S. District Judge Marilyn Hall Patel earlier ruled, "The records in this case go (to) the very essence of what the government was up to during a turbulent, historic period of time."

The FBI's secret history at UC begins at the dawn of the Cold War, when the bureau's intelligence-gathering authority was expanded in response to threats at home and abroad -- and civil liberties collided with concerns about national security.

™ © 2007 Hearst Communications Inc.



**SFGate.com**

**Quick Search**

[ GO ]

Advanced Search

▸SFGate Home
▸Today's Chronicle

▸Sports
▸Business
▸Entertainment
▸Food&Dining
▸Travel

**News & Features**
▸Opinion
▸Politics
▸Technology
▸Crime
▸Science
▸Cars
▸Small Business
▸Weird News
▸Polls
▸Photo Gallery
▸Video Reports
▸Audio Slideshows
▸Columnists
▸Travel
▸Lottery
▸Obituaries
▸Blogs

**Community Blogs**
By our readers for
our readers  BETA

▸Newspaper Ads

**Classifieds**
▸Jobs
▸Personals
▸Real Estate
▸Rentals
▸Cars

**Regional**
▸Traffic
▸Weather
▸Live Views
▸Maps
▸Bay Area Traveler
▸Wine Country
▸Reno & Tahoe
▸Ski & Snow
▸Outdoors
▸Earthquakes
▸Education
▸Chronicle Watch
▸Public Notices

**Entertainment**
▸Food & Dining
▸Wine
▸96 Hours
▸Movies
▸Music & Nightlife
▸Events
▸Performance
▸Art
▸Books
▸Comics
▸TV & Radio
▸Search Listings

---

**the campus files**            **A Chronicle Special Report**

## The FBI's secret UC files

Seth Rosenfeld, Chronicle Staff Writer

Sunday, June 9, 2002     **San Francisco Chronicle**



On the night of Nov. 9, 1945, FBI counterespionage agents staked out a house on Keeler Street in the hills above the Campanile and gentle green slopes of the UC Berkeley campus.

As fog blew through the trees, the agents watched George Eltenton, a suspected spy for the Soviets, park his car and enter the house.

World War II had ended only three months earlier when the United States dropped on Japan two atomic bombs built with help from the university's radiation labs.

Allies during the war, America and the Soviet Union suddenly became adversaries as the Soviets imposed an "iron curtain" across Europe. Russia seemed bent on world domination, and fear of nuclear war spread.

U.S. officials saw the American Communist Party as a Soviet-controlled organization whose members infiltrated society, subverted government with propaganda and might engage in sabotage and espionage.

J. Edgar Hoover, the powerful FBI chief, led the nation's crusade against communism. He transformed the prewar FBI, which had focused on taking down gangsters like Machine Gun Kelley and Baby Face Nelson, into a formidable domestic intelligence agency.

Hoover's agents were closing in on Eltenton, a British citizen who had lived in the Soviet Union before the war. Eltenton was working as a chemical engineer at the Shell Development Laboratory in Emeryville.

In June 1946 three FBI agents picked up Eltenton for questioning. He admitted, according to FBI documents, that several years earlier, at the behest of the Soviet Consulate in San Francisco, he had tried to illegally obtain secret data about Berkeley's radiation lab.

In 1947, Eltenton moved back to Britain and never was prosecuted.

But in 1950, FBI counterespionage agents arrested Communist Party members Julius and Ethel Rosenberg for giving the Soviets classified information taken from the atomic bomb project. The Rosenbergs would later be executed for what Hoover called "the crime of the century."

The FBI's mission was nothing less than protecting the American way of life. But so sweeping were the presidential directives granting the FBI intelligence authority that bureau officials could investigate virtually any person or group they deemed "subversive."

Operating in a crisis atmosphere with little oversight, the FBI would soon begin misusing its vast intelligence files to get university employees fired.

### Secret accusations

In his corner office at the FBI's granite headquarters in

Campus Files Home

1. Introduction
2. FBI's Secret UC files
3. Trouble On Campus
4. Governor's Race
5. The Legacy — Epilogue
6. The 17-Year Legal Battle
7. Where Are They Now?
• A Note On Sources

The FBI Files
• Censored and
  uncensored docs

Timeline
• 1945-1960
• 1961-1965
• 1966-1973

Galleries
• Decade of Student Protest
• An Era of Secrecy

**Living**
► Health
► Home & Garden
► Gay & Lesbian
► Horoscope

**Resources**
► RSS Feeds
► My Feeds
► Search & Archives
► Feedback/Contacts
► Corrections
► Newsletters
► Promotions
► Site Index

**Advertising**
► Advertise Online
► Advertise in Print
► Place a Classified
► SF Gate Media Kit

**Newspaper**
► Advertise
► Chronicle
  In Education
► Contacts
► Chronicle Events
► FAQ
► Jobs at
  the Chronicle
► Submissions

**Subscriber Service**
► Get Home Delivery
► Manage Account,
  Missed Delivery,
  Vacation Hold



Washington, D.C., Hoover was growing increasingly concerned about the communist threat to the nation's colleges.

Communists were infiltrating the teaching corps, his top aides concluded, so they could "insidiously instill into the minds of children the communist party line."

On Feb. 17, 1951, the director initiated a secret nationwide program intended to remove politically suspect employees from their jobs with state and local agencies, public utilities and schools.

It was ostensibly aimed at members of the Communist Party and others whom FBI officials deemed "potentially dangerous . . . in the event of an emergency to the internal security of this country."

But the program relied on questionable evidence, according to a 1976 Congressional report.

Code-named the Responsibilities Program, it never was authorized by Congress or the White House. And according to Athan Theoharis, a Marquette University history professor and former U.S. Senate consultant who has studied the little-known operation, the FBI had no jurisdiction for it.

Under the four-year program, the FBI gave the governors of nearly every state verbal reports on the political backgrounds of 908 employees.

In California, FBI agents passed allegations about 206 employees -- more than in any other state -- to Gov. Earl Warren. At least 15 were on the UC staff, FBI memos show.

The accused employees never had a chance to confront their accusers. An FBI memo later estimated that more than 500 of those accused were fired, quit, or otherwise left their jobs.

Some UC officials privately complained that the FBI's allegations were "vague" and "unsubstantiated," but Hoover was pleased with the results.

### The Burns report



The director's concern about subversives at UC was heightened by sensational hearings conducted by state Sen. Hugh M. Burns and his Fact-Finding Subcommittee on Un-American Activities.

A onetime funeral home proprietor, Burns was a Fresno Democrat devoted to fighting communism. His publicity-seeking committee was a California version of the House Committee on Un-American Activities (commonly known as HUAC), issuing biannual reports and cooperating closely with the FBI.

In June 1951, the Burns committee released a 291-page report that claimed UC had "wittingly or unwittingly . . . aided and abetted the international communist conspiracy in this country." The Berkeley campus, the report alleged, was a hotbed of Soviet spies seeking atomic secrets.

UC President Robert Gordon Sproul denied the charges. A faculty group noted Burns failed to identify a single communist faculty member or student group presently on campus.

But Bay Area newspapers ran stories headlined "California Warned Reds on Campus" and "Report Charges UC Chiefs Aided Conspiracy of Reds."

And in March 1952 Burns began his own program to bar alleged

subversives from campus, arranging for every California college to appoint a "contact man" on its staff to help the committee screen faculty.

But one contact man refused to cooperate.

**Clark Kerr's first test**

In July 1952 Clark Kerr became the first chancellor of UC Berkeley, taking over the university's flagship campus.

The son of a Pennsylvania farmer and the descendant of Appalachian pioneers, Kerr had attended Swarthmore College, where he adopted the pacifist Quaker faith. He later earned a graduate degree in economics at UC Berkeley.

During World War II, Kerr served as a federal labor arbitrator, settling workplace disputes to keep Seattle's Boeing plant rolling out bombers to fight Germany. He returned to UC Berkeley in 1945 to teach labor economics and help found its Institute of Industrial Relations -- and soon found himself at the center of one of the Cold War's most bitter controversies over academic freedom.

In 1949, the university's Board of Regents voted to require all employees to sign a loyalty oath -- in addition to the oath of allegiance all state employees already signed -- swearing they did not belong to any group advocating violent revolution.

Kerr signed the loyalty oath. He also voted to support the university's policy declaring that Communist Party members were too biased to teach.

But he defended the professors who refused to sign the loyalty oath, characterizing them as some of "the most independent spirits in the university."

Those professors were fired. But Kerr's calm defense of academic independence won respect from both the faculty and the regents, who named him chancellor, partly in the hope that his appointment would heal wounds from the oath controversy. (The fired faculty members by then had sued and won reinstatement.)

As chancellor, Kerr would have access to the university's top-secret nuclear weapons labs, so the FBI thoroughly investigated his background. He was granted a "Q" security clearance -- the highest level.

The day before Kerr was officially introduced to the Berkeley campus, Sproul surprised Kerr by publicly naming him UC Berkeley's "contact man" for the Burns committee.

Kerr regarded the committee's reports as exaggerated and based on rumor and innuendo. Kerr made clear he would have nothing to do with Burns' system of contact men until he consulted students and faculty.

"I shall be eternally vigilant to preserve freedom of inquiry and freedom of expression for the students and for the faculty," Kerr said in an Oct. 1, 1952, campus speech.

"In a world increasingly hostile to independent minds, this should always be the foremost concern of a university administration. Freedom was bought at a high price. It must not be sold at any price."

**A plot against Kerr**

Kerr was inaugurated as UC's 12th president on Sept. 29, 1958, with an elaborate ceremony at Berkeley's Greek Theatre that drew dignitaries from colleges around the world.

In six years as chancellor, Kerr had steered Berkeley toward top academic rankings, won approval for a dozen new dormitories and a student union, and become known for supporting the scholar's "right of free choice, free study and free communication of ideas."

Now the 47-year-old Kerr was taking over the world's largest research university and a key defense contractor at a time of extreme Cold War tensions.

Kerr's rise worried some observers, including top FBI officials.

Two weeks after his inauguration, Richard Auerbach, special agent in charge of the FBI's San Francisco office, sent Hoover a dark memo.

"Dr. Kerr," he wrote, "has always given the impression that he is a 'liberal' in the educational field, that he is not in sympathy with loyalty oaths . . . not in complete accord with the fact that various branches of the state and local government must conduct security investigations of individuals on the various campuses . . . .

"Dr. Kerr . . . at best is a highly controversial figure in California education."

Auerbach's memo went on to brief Hoover on a secret plan to oust Kerr. According to his Oct. 18, 1958, memo:

Richard Combs, the Burns committee's longtime counsel, chief investigator and driving force behind the contact man program, had just held a meeting at his home in the Central Valley.

Present was William Wadman, UC's security officer and a veteran FBI source on campus political activities, along with members of the Alameda County District Attorney's Office and the Berkeley Police Department.

At the meeting, Combs presented "a sinister picture." He claimed Kerr had associated with "persons of questionable loyalty" and helped "liberals and leftists get ahead." He theorized Kerr "might be an undercover Communist."

Combs vowed to investigate Kerr and wanted "assistance from a right-wing group of University officials who would be in a position to observe Kerr close at hand."

"The ultimate aim of this plan," Combs told the group, "would be to compile a documented and convincing history of Kerr, showing him to be a dangerous radical (and) to present this to the right people" -- such as sympathetic regents.

"The purpose would be to try to get Kerr neutralized in his present job or even removed."

UC security officer Wadman and the others pledged to help Combs, and one of them briefed an FBI agent on their plan.

In his memo to Hoover, Auerbach said he was reporting Combs' plot to headquarters "merely for its information and in the event that the Bureau may receive some inquiry concerning Dr. Kerr."

Hoover filed the memo in his expanding file on the university. His concern about the campus would soon turn to outrage -- all because of a simple essay question.

### The essay question

It was optional question number 7 on UC's 1959 English aptitude test for

high school applicants -- and Hoover was livid:

"What are the dangers to a democracy of a national police organization, like the FBI, which operates secretly and is unresponsive to public criticism?"

Hoover took any attack on the FBI personally. As soon as he learned about the essay question, he ordered Assistant FBI Director Cartha "Deke" DeLoach to start a covert public relations campaign to embarrass the university and pressure it to retract the question.

"We really should stir up as many protests re (sic) this as possible," Hoover ordered.

DeLoach, a high official in the American Legion, enlisted his fellow legionnaires to fire a barrage of irate letters at the university.

At the FBI's urging, the head of the International Association of Chiefs of Police and a "Bureau-minded" member of the Los Angeles Archdiocese each publicly condemned the question.

In San Francisco, Auerbach met with Gov. Edmund G. "Pat" Brown and made him aware of Hoover's "extreme displeasure regarding the aptitude test question."

Auerbach also called on "a few friendly sources" in the media, including the publishers of the San Francisco Examiner (then owned by the Hearst Corp.) and the San Francisco Chronicle (then owned by the DeYoung family and now owned by Hearst).

And Hoover personally complained to Brown, who was ex-officio president of the regents, and four other regents, calling the question a "gross error."

The campaign worked. Brown promptly chastised UC officials. On Feb. 19, 1960, the regents retracted the question, expressing their "regret" and affirming their "highest respect" for the FBI.

In an interview with The Chronicle, DeLoach said the FBI was merely trying to "set the record straight."

At the time, Hoover couldn't resist gloating. In a "Dear Dick" letter to Vice President Richard Nixon, the director described the "storm of protest" that arose in response to the "viciously misleading question."

And he was just getting started.

**The wrong man**

Hoover next ordered his agents to identify the author of the question, and they soon focused on UCLA English professor Everett Jones, combing their files for any derogatory information on him.

A few weeks later, UCLA chancellor Vern Knudsen received an anonymous letter attacking the loyalty of Jones and his wife. Copies also went to three Los Angeles newspapers.

The FBI's files don't say who wrote the letter. In an interview, DeLoach said he had no recollection of the episode.

The letter claimed that in the mid-1940s the Joneses were "fanatical adherents to communism." It said the couple were present at parties attended by communists in the 1950s. Everett Jones, it said, had "inherited" leftist sympathies from his father, a former Unitarian minister.

The letter added that "it is indeed impossible to believe that UCLA or any other educational institution would knowingly place a person with Everett Jones' record in a position where he can so effectively poison the minds of American Youth."

Knudsen prepared a statement saying he normally ignored anonymous allegations, but he had questioned Jones about the letter. Jones denied ever being in the Communist Party and noted he had signed the university's loyalty oath.

In any event, the chancellor added, Jones had "no part" in preparing the essay question.

The FBI, it seems, had the wrong man.

**The Security Index**

Hoover now set his sights on the entire university.

He ordered his agents to search the bureau's files for any derogatory information about UC's 6,000 faculty members and top administrators around the state.

On March 2, 1960, he received a 60-page report on UC's "political complexion." DeLoach, who prepared the report, told The Chronicle that the FBI was just sizing up the university that had come out with the controversial essay question.

The report said 72 faculty members, students and employees were listed in the bureau's "Security Index," a secret list of people whom the FBI considered potentially dangerous to national security during a crisis and would detain indefinitely without judicial warrant.

Bay Area detainees, a former FBI agent told The Chronicle, were to be held on Angel Island.

Hoover had started keeping the nationwide index in 1940, according to a 1976 study by the U.S. Senate Committee to Study Governmental Operations with Respect to Intelligence Activities.

He ignored an attorney general's 1943 order to destroy the list because it was "impractical, unwise and dangerous," said the committee, which was headed by Sen. Frank Church, D-Idaho.

At its height in 1954, the Security Index contained the names of 26,174 people. The index listed not only alleged communists, but suspected communists and individuals who had "shown sympathy" to communist objectives. It included people involved in labor unions, civil rights groups, the film industry and schools.

Congress was not told about the detention plan, according to the Church committee, which also found the plan failed to meet 1950 statutory requirements that there was "reasonable ground to believe" prospective detainees would engage in espionage or sabotage.

The FBI's report on UC also alleged that faculty members had engaged in a panoply of other misconduct:

· 141 professors had committed miscellaneous misdeeds such as "writing a play that glorified the Chinese Communist Army";

· 54 professors or their family members subscribed or contributed to publications the bureau deemed subversive;

· 40 faculty members had protested the state's loyalty oath;

· 27 had close relatives who were former members or contributors to the Communist Party;

· 22 professors had been involved in "illicit love affairs, homosexuality, sexual perversion, excessive drinking or other instances of conduct reflecting mental instability."

But the FBI found nothing in its files about UC Berkeley English professor James Lynch who, the bureau finally learned, had written the offensive essay question.

Kerr had been in Argentina at a conference on education during the essay-question imbroglio.

On March 28, 1960, he wrote Hoover to express his regret about the question and to ask the director to raise any future concerns about the university "directly with me as president."

But Hoover snubbed Kerr's overture.

"If we have any further difficulties," Hoover told his aides, "we will deal with the regents as we recently did."

### The protest at City Hall



On May 13, 1960, hundreds of demonstrators — many of them UC Berkeley students -- gathered at San Francisco's City Hall to protest hearings being conducted there by the House Committee on Un-American Activities.

When the demonstrators were barred from the hearing room, a loud scuffle broke out. The police turned on high-pressure fire hoses and blasted the crowd down the marble steps.

Officers arrested 64 people, including 31 Berkeley students, but instead of discouraging the protest, the confrontation became a call to arms. The next day 5,000 people protested the HUAC hearings at City Hall.

The incident marked not only HUAC's decline but the noisy arrival of a new generation of students, the first stirrings of a youth movement that, even then, seemed centered in Berkeley.

It took the FBI by surprise.

"Yesterday . . . we had a demonstration of Communist strength in San Francisco, the likes of which have not been seen since the infamous 1934 strike," Auerbach told Hoover. His memo compared the City Hall protest to the violent strike that was led by San Francisco labor leader Harry Bridges and shut down the West Coast maritime industry.

"What is particularly significant, and undoubtedly of special interest to you, is the fact that much of the manpower for this riotous situation was provided by students of the University of California at Berkeley.

"Since Clark Kerr has become President, the situation on all campuses has deteriorated to the point where the so-called academic freedom has become academic license.

"The attack on the FBI in the English 'A' examination was merely one example of the deterioration of the morality and patriotism at this great university, which soon will have fifty thousand students in its halls,"

In June 1960, a San Francisco judge dismissed all charges of disturbing the peace against 63 of the City Hall arrestees.

Several months later, in a widely publicized report entitled "Communist Target — Youth: Communist Infiltration and Agitation Tactics," the FBI director blamed the melee on the students, claiming they had been duped by communists.

Hoover charged that UC Berkeley student Robert Meisenbach "provided the spark that touched off the flame of violence." He alleged that Meisenbach leaped over a barricade, grabbed a policeman's billy club and used it to beat the officer.

But in May 1961 a jury acquitted Meisenbach.

Hoover's "Communist Target -- Youth" may have been discredited. But it already had caught the eye of a politically ambitious actor named Ronald Reagan.

### 'The FBI Story'

On Aug. 26, 1960, Reagan had the Hollywood operator place a call to FBI headquarters in Washington and asked to speak with Hoover. Told the director was out, he was connected to DeLoach, the assistant director.

Reagan introduced himself as the host of "General Electric Theater," a popular Sunday night television drama. He said he wanted to produce a special program based on the "Communist Target — Youth" report. Hoover could appear at the end of the program to warn viewers about the communist threat, he added, which would be "a great public service."

Over the years, Reagan and the FBI had engaged each other through a series of contacts that catalyzed his political metamorphosis.

He had come to Hollywood in 1937 and three years later played George Gipp in his most acclaimed film, "Knute Rockne -- All American." He was a Democrat who gave his name and time to groups promoting liberal policies at home and abroad.

But as the Cold War began, the FBI suspected that some of those groups included Communist Party members trying to promote the Soviet cause. As Reagan recalled in his memoir, "An American Life," FBI agents approached him in 1946 and shared their insights about the communist effort to take over Hollywood.

Reagan's book suggests that this and other discussions with FBI agents inspired him to fight communism, which led him to run for president of the Screen Actors Guild and "indirectly . . . set me on the road that would lead me to politics."

In 1985, the FBI released some documents about Reagan. A spokesman for Reagan said at the time that the president played only a "very minor" involvement with the bureau. The spokesman claimed that the FBI was merely contacting people who had testified before HUAC.

Those documents described an April 10, 1947, meeting between FBI agents, Reagan, then SAG president, and his first wife, actress Jane Wyman at the Reagans' Hollywood home, where they identified colleagues "who they suspected were carrying on Communist Party work."

Newly released FBI records obtained by The Chronicle reveal that the actors named by Reagan and Wyman that day included Larry Parks ("The Jolson Story"), Howard Da Silva ("The Lost Weekend") and Alexander Knox ("Wilson"). Each was later called to testify before the House Committee on Un-American Activities and blacklisted from working in

Hollywood.

And over the years, the new documents show, Reagan's contacts with the bureau were far more extensive than he acknowledged or has been reported.

In May 1947, Reagan gave the FBI the name of another actor involved in liberal causes (the actor's name is deleted in the FBI documents).

That October, Reagan went to Washington, D.C., to testify as a friendly witness at a HUAC hearing on communism in the movie business. At a dinner attended by Hoover, Reagan remarked that Quentin Reynolds, a prominent journalist who had criticized the HUAC hearing, was "said to be a communist."

Reagan continued to periodically phone the FBI to report people he suspected were communists, based, apparently, on his brief encounters with them.

One was a young starlet who at a 1959 Hollywood soiree disagreed with blacklisting actors who had refused to testify against their colleagues. (The FBI deleted her name in the records.)

Another was an unnamed Los Angeles college student who questioned Reagan after he gave a 1960 speech on behalf of Democrats for Nixon. The student, Reagan told the FBI, asked questions "right down the commie line."

DeLoach told The Chronicle that Reagan was not an informant, saying, "He never was a close contact of ours. He was never a source of information. There was no unique relationship."

In an interview, Edwin Meese III said Reagan and the FBI had "back and forth" contact during this period. "He felt that the contacts with the bureau were very helpful to him during that period."

Wyman did not respond to a request for comment through her Hollywood representative, Jan Stern.

Reagan also saw the dramatic potential in fighting communism, new documents show.

In 1958, he sought to play the part of Special Agent George Crandall in a movie to be called "The FBI Story." So eager was he to play the valiant agent killed in the line of duty that he offered to take half of his normal $75,000 fee.

But the Los Angeles FBI chief checked the bureau's files and found that Reagan had been "associated with certain Communist front organizations" in the mid-1940s, before he "suddenly saw the light."

The FBI was wary of giving the bureau's imprimatur to the ex-liberal. "Sounds as though Reagan would consider this another stamp to block out the past," the agent wrote. "If it reaches an issue I am just going to say 'No.' "

The role of Crandall in the 1959 film went to Larry Pennell.

By the end of the decade, Reagan's film career had stalled -- he claimed Hollywood liberals were punishing him because of his anti-communist work -- and he was hired by General Electric, hosting its weekly television show and making speeches to GE employees.

At first his talks focused on fighting communism in Hollywood, but they increasingly embraced broader conservative concerns like "encroaching

government controls." Liberalism, he said at one point, was a disguise for "socialist revolution."

And he was inspired when he read Hoover's "Communist Target -- Youth" report on the protests against HUAC at San Francisco City Hall.

In September 1960, after he broached the idea for a television special with DeLoach, the bureau again checked its files on Reagan.

"He has been contacted on several occasions by agents of our Los Angeles Office and in every instance has been cooperative and helpful," the resulting memo said.

"He in turn has visited our Los Angeles office, and our relations with him have been cordial."

But on Sept. 8, 1960, Reagan again phoned Hoover only to be told the director was unavailable. Reagan declined to speak with anyone else.

The next day, he made one last pitch to do the show, but DeLoach said the answer was still no.

The FBI wasn't ready to take the stage with him -- not yet.

™ © 2007 Hearst Communications Inc.



**SFGate.com**

**Quick Search**

GO

**Advanced Search**

▸SFGate Home
▸Today's Chronicle

▸**Sports**
▸**Business**
▸**Entertainment**
▸**Food&Dining**
▸**Travel**

**News & Features**
▸Opinion
▸Politics
▸Technology
▸Crime
▸Science
▸Cars
▸Small Business
▸Weird News
▸Polls
▸Photo Gallery
▸Video Reports
▸Audio Slideshows
▸Columnists
▸Travel
▸Lottery
▸Obituaries
▸Blogs

**Community Blogs**
By our readers for
our readers **BETA**

▸Newspaper Ads

**Classifieds**
▸Jobs
▸Personals
▸Real Estate
▸Rentals
▸Cars

**Regional**
▸Traffic
▸Weather
▸Live Views
▸Maps
▸Bay Area Traveler
▸Wine Country
▸Reno & Tahoe
▸Ski & Snow
▸Outdoors
▸Earthquakes
▸Education
▸Chronicle Watch
▸Public Notices

**Entertainment**
▸Food & Dining
▸Wine
▸96 Hours
▸Movies
▸Music & Nightlife
▸Events
▸Performance
▸Art
▸Books
▸Comics
▸TV & Radio
▸Search Listings

**the campus files**   A Chronicle Special Report

## Trouble on campus
Seth Rosenfeld, Chronicle Staff Writer

Sunday, June 9, 2002

**San Francisco Chronicle**

Thousands of students were surrounding the white campus police car and sitting down, holding it captive in the middle of UC Berkeley's sun-bleached Sproul Plaza.

The Oct. 1, 1964, sit-in had begun spontaneously, moments after police arrested a former student who was soliciting donations for a civil rights group and loaded him into the car.

As the crowd clapped and chanted, "Let him go," FBI agents in the crowd of bystanders watched in amazement, snapping photographs and jotting down names they would rush back to Hoover at headquarters.

The confrontation had been building since students returned to UC Berkeley that fall and learned that school officials had begun enforcing a ban on all political activity on campus, even collecting quarters for causes and handing out leaflets.

It was a new generation of students. A good number of them had spent their vacation with the Mississippi Summer Project, registering black voters in the face of attacks from the Ku Klux Klan. They were willing not only to question authority but to defy it.

Instead of obeying the new campus rule, some of the activists had taunted university officials by setting up their card tables in front of Sproul Hall, the main administration building, and passing out flyers for groups ranging from the Congress on Racial Equality to the Young Republicans.

Finally, on that Thursday morning, the administration acted.

Campus police drove onto the plaza and arrested Jack Weinberg. For the rest of the day and into the night, students took turns mounting the soon-crushed car roof, using it as a platform from which they condemned the political ban as a violation of their constitutional right of free speech.

As the hours wore on -- and with Weinberg still in the back seat of the police car -- anxious administrators summoned hundreds of helmeted police officers from around the Bay Area, who lined up behind Sproul Hall in battle formation.

Fearing violence, Kerr urgently negotiated with the protesters, including philosophy student Mario Savio, whose impassioned speeches that day instantly made him a leader of the demonstration.

Thirty-two hours passed before Savio once again mounted the car roof and announced that Kerr and the protesters had reached an agreement: The students would stop their illegal protests, and the university would review its ban on political advocacy.

"I ask you to rise quietly and with dignity, and go home," Savio said.

**Campus Files Home**
1. Introduction
2. FBI's Secret UC files
3. Trouble On Campus
4. Governor's Race
5. The Legacy – Epilogue
6. The 17-Year Legal Battle
7. Where Are They Now?
• A Note On Sources

The FBI Files
• Censored and uncensored docs

Timeline
• 1945-1960
• 1961-1965
• 1966-1973

Galleries
• Decade of Student Protest
• An Era of Secrecy

**Living**
›Health
›Home & Garden
›Gay & Lesbian
›Horoscope

**Resources**
›RSS Feeds
•My Feeds
›Search & Archives
›Feedback/Contacts
›Corrections
›Newsletters
›Promotions
›Site Index

**Advertising**
›Advertise Online
•Advertise in Print
›Place a Classified
›SF Gate Media Kit

**Newspaper**
›Advertise
›Chronicle
   in Education
›Contacts
›Chronicle Events
›FAQ
›Jobs at
   the Chronicle
›Submissions

**Subscriber
Service**
›Get Home Delivery
›Manage Account,
   Missed Delivery,
   Vacation Hold

Disaster had been averted, but the students soon formed the Free Speech Movement. In the following months, they would stage the first major campus protests of the 1960s.

The FSM's use of sit-ins, pickets and other kinds of nonviolent civil disobedience tactics borrowed from Mahatma Gandhi by way of the civil rights movement would shock a public accustomed to campus conformity and make news around the world.

The protests would also create a crisis for Kerr -- and jolt the FBI into action.

**A leak to the press**

In Washington, Hoover reviewed the reports and photographs his agents had taken on campus.

He was not pleased.

First came the university's suggestive essay question about the FBI in 1959. Then Berkeley students joined in the 1960 demonstrations against the House Un-American Activities Committee at San Francisco City Hall. Now they had captured a police car.

Hoover ordered agents around the country to determine whether the FSM was influenced by the Communist Party or other subversive groups, and whether the protest violated federal laws against civil disturbances.

But the bureau's investigation quickly expanded beyond the FSM's leaders to include their family members, faculty supporters, a CBS newsman who reported on them, even a company that produced an album of Free Speech Movement Christmas carols.

And Hoover soon went beyond gathering intelligence and began covertly manipulating public opinion about campus events.

At his direction, the San Francisco FBI office slipped information about some protesters' past political activities and arrests at civil rights demonstrations to Ed Montgomery of the San Francisco Examiner, a Pulitzer Prize-winning reporter who had developed an unusually close relationship with the bureau.

In late November 1964, the Examiner published his series depicting the Free Speech Movement as a "Marxist dominated" plot to disrupt colleges around the country.

Curtis Lynum, the new head of the FBI's San Francisco office, was pleased.

"These are excellent articles," Lynum reported to Hoover. "They deal with subversive affiliations on the part of some of the more prominent demonstrators and they have been the subject of considerable discussion among state administrators, university administrators, students, and the general public, on a state-wide basis. They were extremely timely . . . ."

In an interview with The Chronicle, Lynum said he helped Montgomery on some stories but did not recall giving him material for the series.

The stories had a broader political effect. Fred Dutton, a former regent who was Brown's 1960 campaign manager, told The Chronicle that they cast Kerr and Brown as failing to control not just unruly students, but a new threat to national security.

And the trouble on campus was just starting.

### Sit-in at Sproul Hall

The crowd in Sproul Plaza on Dec. 2, 1964, was
unusually large and tense.



For weeks the FSM had been holding noon rallies
on the plaza, demanding that the administration lift the ban on political
activity.

Finally the FSM issued an ultimatum: The demonstrators would take
"direct action" in 24 hours -- unless the administration dropped both the
political ban and disciplinary charges against protest leaders, including
Savio.

The administration had spurned the ultimatum. Now speakers were urging
the tightly packed crowd of 4,000 to take over Sproul Hall.

Savio gave what would become his most famous speech. It was not only a
fiery reply to Kerr's characterization of the modern university as part of a
knowledge "industry" but a rebuke of bureaucratic society.

"There is a time when the operation of the machine becomes so odious,
makes you so sick at heart, that you can't take part; you can't even
passively take part, and you've got to put your bodies upon the gears and
upon the wheels, upon the levers, upon all the apparatus and you've got to
make it stop.

"And you've got to indicate to the people who run it, to the people who own
it, that unless you're free, the machine will be prevented from working at
all."

The speech electrified the crowd. And as a young folk singer named Joan
Baez sang "We Shall Overcome," more than 1,000 people filed into the
administration building and occupied all four floors.

As night fell and the sit-in continued, Kerr once again sought to avert
violence, arguing against bringing in police. But this time Brown overruled
him and ordered the police to clear the building.

Just after 3 a.m., more than 600 officers entered Sproul Hall. The
demonstrators refused to leave. Instead they went limp, forcing the police
to carry them out. It took 12 hours to remove nearly 800 protesters.

The arrests set off more protests. Nearly 10,000 people attended a Dec. 4
rally at Sproul Plaza, during which the featured speakers, San Francisco
Assemblymen Willie Brown and John Burton, denounced the arrests. In
the following days, 5,000 students picketed the campus and thousands
more boycotted classes. Many of them wore IBM punch cards that read, "I
am a student: Do Not Fold, Spindle or Mutilate."

Desperately trying to re-establish order, Kerr called an unprecedented
campus-wide meeting at the Greek Theatre on Dec. 7.

### Incident at the Greek Theatre



Some 16,000 people jammed the amphitheater that Monday
to hear Kerr propose a compromise that still fell short of
granting students the constitutional right of free speech on
campus.

Just as Kerr finished his address, Savio strode toward the podium. Two
police officers grabbed him and dragged him away by his coat and tie. The
audience was stunned by the sudden use of force. Many people began to
chant, "Let him speak!" After a few minutes, Kerr relented. Savio tersely
announced a counter-rally immediately afterward at Sproul Plaza.

The manhandling of Savio outraged many professors. On Dec. 8, the Berkeley faculty overwhelmingly voted to back the FSM's demand that UC rescind the rule against political advocacy on campus.

The next day, a worried Brown called Lynum from his home. Brown said he feared the Board of Regents was losing control of the university. He asked about Montgomery's Examiner stories, and Lynum said they were "very factual."

Then the governor asked for FBI information on the demonstrators that he could use in making "the proper suggestions" at the next regents meeting.

Lynum contacted Hoover, who agreed to Brown's request. On Dec. 14, Lynum met with Brown and confidentially gave him reports about the alleged "communist affiliations" of 14 students and five faculty who had been present during the demonstrations.

In an interview, Lynum said the FBI's cooperation with the governor was proper.

But on Dec. 18, the regents conceded the FSM's main point by affirming that university rules should follow U.S. Supreme Court decisions on free speech.

As far as Hoover was concerned, the university was tumbling into chaos. Even as the regents met, he ordered the San Francisco FBI to intensify its investigation of the FSM and "go beyond usual steps."

And then he got the request from the White House.

### Report to the White House

President Lyndon Johnson summoned Kerr to the Oval Office in early December 1964 and said he wanted to name him Secretary for Health, Education and Welfare.

"I've looked from the Pacific to the Atlantic and from Mexico to Canada, and you're the man I want," Johnson said, according to Kerr.

Johnson had directed the FBI to conduct a routine background investigation into Kerr's character, reputation and loyalty.

But as a U.S. District Court would later rule in the Freedom of Information Act suit for the campus files, Hoover used the process as a "pretext" to sabotage Kerr's career.

On Dec. 31, 1964, the director sent Johnson a summary of the FBI's findings.

The report noted that over the years Kerr had been appointed to federal advisory boards by Presidents Eisenhower, Kennedy and Johnson.

The report said that most of the people interviewed by the FBI were overwhelmingly positive about Kerr. It said FBI informers inside the Communist Party had no information on Kerr.

But the FBI slanted the 12-page report by including damaging allegations against Kerr -- without telling Johnson that the bureau had investigated each of the charges and found them untrue.

Nearly three pages were devoted to allegations made by Richard Combs, the Burns committee legal counsel.

Combs repeated a claim allegedly made in 1953 by a man named Louis

Hicks who had worked with Kerr at the federal War Labor Board in San Francisco in the 1940s. Hicks, said Combs, had alleged that Kerr was "pro-communist."

The report failed to note that when the FBI later interviewed Hicks, he denied making the charge.

Combs also claimed that when Kerr worked for the War Labor Board, he was closely associated with Sam Kagel, a well-known labor arbitrator who was allegedly pro-communist.

That charge had been made in 1958 by Wadman, the UC security officer and FBI contact who had pledged to help Combs get Kerr fired.

The report failed to say that the FBI had found no evidence that Kerr and Kagel had more than a professional relationship, and that the communist charge against Kagel was itself not credible.

Kagel told The Chronicle he never was a communist.

Finally, Combs claimed that Kerr, while chancellor of UC Berkeley, had employed two women who were later dismissed as security risks. That charge also came from Wadman.

The report failed to say that the FBI found the women "have never been dismissed for security reasons."

Hoover's report to Johnson also included a page of comments from Don Mulford, an East Bay assemblyman who had sharply criticized Kerr for easing university policies on student political activity and letting communists and socialists speak on campus.

But Hoover also sent the White House a separate letter containing more ominous allegations that Mulford did not want attributed to him in the report — allegations the FBI knew were unfounded.

Mulford portrayed Kerr as part of a communist conspiracy. He claimed that a source -- whose name he could not recall -- had told him Kerr had "some connections with the Communist Party during World War II."

And now, Mulford said, it seemed "someone has a hold over" Kerr, suggesting that this explained his appointment of "left wing" professors and his refusal to crack down on protesters.

In an interview, DeLoach denied that the FBI had tried to damage Kerr's reputation.

Kerr told The Chronicle he was unaware that Hoover had sent any falsehoods to the White House.

Johnson had meanwhile decided to withdraw the HEW offer to Kerr, Kerr said. Johnson complained that news of the possible appointment had leaked to the press.

## No evidence

Hoover still was determined to turn public sentiment against the Free Speech Movement.

He wanted to publish a new report exposing communist influence on the Free Speech Movement, similar to the FBI's "Communist Target -- Youth" report about the 1960 City Hall protests against HUAC.

So Hoover ordered the San Francisco FBI office to prepare a memo

"pinpointing" the role communists played in the FSM protests.

There was only one problem: Lynum had found no evidence that communists and other subversives played a significant role in the Free Speech Movement.

"It is the opinion of this office that subversive participation in the demonstrations did not have any bearing on the measure of success achieved," Lynum wrote in a Jan. 8, 1965, memo to Hoover.

Some communists and socialists were among the tens of thousands of participants, Lynum wrote, but "the demonstrations would have taken place with or without any participation by subversives, because of basic grievances."

Eleven days later, Lynum sent headquarters another memo saying, "In the UC demonstrations there were over 22 different organizations involved, ranging in views from the far left to the far right, who were of the opinion that their constitutional rights of free speech were being regulated and opposed by the UC Administration.

"No information has been reported from any confidential informants indicating that the (Communist Party) played a direct role in the UC demonstrations," he added in the Jan. 19, 1965, memo.

It was at that point, the federal court of appeals would later rule in the FOIA suit, that the FBI's investigation of the Free Speech Movement ceased to have any legitimate purpose and "came to focus on political rather than law enforcement aims."

The FBI never published a report on the Free Speech Movement.

But Hoover wasn't going to let the lack of evidence deter him from pursuing the protesters and the university administrators -- "bleeding hearts," he had called them -- who had failed to do the job themselves.

Kerr, Hoover had concluded, was "no good."

**Enter the CIA**

CIA Director John McCone arrived at Hoover's office in the Justice Department building at 3:30 p.m. on Thursday, Jan. 28, 1965, and the nation's two most powerful intelligence officials began to bluntly discuss taking "corrective action" at Berkeley.

McCone had made a fortune working with Stephen Bechtel, building refineries and power plants in the 1930s and hundreds of ships during World War II.

President Eisenhower named McCone head of the Atomic Energy Commission in 1958. President John F. Kennedy named him head of the CIA in 1961, and he guided the agency during the Cuban missile crisis the following year.

McCone had graduated from UC Berkeley in 1922, and he cared deeply about his alma mater.

He and Hoover agreed that much of the problem on campus was that Kerr -- and his key supporter Gov. Brown -- "have given in on everything these young punks causing the trouble have wanted."

But both McCone and Hoover were aware of the sensitive nature of their meeting. The National Security Act of 1947, which created the CIA, also prohibited it from engaging in domestic intelligence activities.

The CIA declined to comment about the meeting.

In an interview with The Chronicle, R. James Woolsey, CIA director from 1993 to 1995, said, "It's entirely inappropriate for a director of Central Intelligence to be involved in anything of this sort dealing with political views or investigations of Americans."

As McCone told Hoover, "Any action taken against subversive types must be handled in a very prudent manner" -- especially given "the general sensitivity of people in the academic world."

The meeting between Hoover and McCone was previously disclosed in an FBI document obtained by author Athan Theoharis.

But documents obtained by The Chronicle show McCone and Hoover proceeded to carry out a secret scheme involving senior regent Edwin Pauley.

Pauley had become a multimillionaire in the oil industry. He had been a part owner of the Los Angeles Rams football team, a director of Western Airlines and a U.S. ambassador.

Pauley had graduated from Berkeley in 1923, one class after his close friend McCone. He was a major donor to the university, which named UCLA's Pauley Pavilion after him. For more than a quarter of a century, Pauley had been a member of the Board of Regents. He was by far its harshest critic of both student protesters and Kerr's handling of them.

As McCone told Hoover, Pauley was very upset about the "situation at Berkeley."

Pauley was "anxious to get a line on any persons who are communists or have communist associations, either on the faculty or in the student body."

Hoover immediately agreed to give Pauley information from confidential FBI files -- in what the federal appeals court in the FOIA suit would later call the FBI's "campaign to have Kerr fired."

As soon as McCone left his office, Hoover phoned Los Angeles FBI chief Wesley Grapp, a trusted veteran agent.

He ordered Grapp to give Pauley anonymous memos on 19 students and faculty members who were "causing trouble at Berkeley."

Hoover said the memos would include only "public source" information. But all of the contents came from the FBI's confidential files.

Pauley could use the memos to discredit the demonstrators and persuade the regents to get tough on them -- and on Kerr.

Hoover admonished Grapp, "It must be impressed upon Mr. Pauley that this data is being furnished in strict confidence."

### Confidential reports

Five days later, Grapp met with Pauley at his office in the Pauley Petroleum Building in Los Angeles for two hours.

Pauley began the Feb. 2 meeting by saying he was upset about the FSM and recalled that "obnoxious question . . . concerning the FBI being a secret police."

He told Grapp he had "no use for Kerr" and had accused the university president of being a "communist or a communist follower."

Pauley explained that the 24-member Board of Regents was divided and that his faction wanted "strong positive action taken immediately to clean up the mess."

The problem, he said, was that so far he'd been unable to muster the votes to fire Kerr. He blamed the impasse on three "ultra-liberal" regents who staunchly backed Kerr.

All were prominent Bay Area Democrats whom Brown had named to the board: William Coblentz, a San Francisco lawyer, was formerly special counsel to Gov. Brown; William M. Roth, a shipping executive, was a member of the ACLU executive committee; and Elinor Haas Heller, who had been a member of the Democratic National Committee.

Pauley told Grapp that he had heard that in the 1950s the FBI secretly gave the university reports on professors it was considering hiring.

He said he wanted to restore the procedure -- which the FBI had code-named the Responsibilities Program -- and offered to pay someone to check FBI files.

Grapp replied, "One of the reasons the FBI is the highly efficient organization it is today is because of the confidence the American public has in us, which is due in part to the fact that our files are confidential."

But after obtaining Pauley's promise not to reveal that the FBI was his source, Grapp handed him Hoover's memos.

Pauley quickly read one.

"This is perfect," he said. "This is just what I need."

It was a three-page report on UC Berkeley immunology professor Leon Wofsy that summarized news stories from 1945 to 1956, noting that Wofsy had been a self-avowed Communist Party official who tried to get young people involved with the party.

The report failed to note that since 1957 the FBI had found no evidence that Wofsy had been involved with the party, and, in any event, one of the FBI's most reliable campus informants had said that although Wofsy supported the FSM, "he exerted no more influence on final decisions than any other single faculty member."

Two days later, Grapp reported to Hoover that Pauley would be "an excellent source of information" about internal university affairs.

Pauley could also "use his influence to curtail, harass and at times eliminate communists and ultra-liberal members on the faculty" -- and on the Board of Regents.

About a week later, Grapp secretly gave Pauley verbal reports containing confidential information about regents Coblentz, Roth and Heller. It concerned their minor involvement with liberal groups in prior decades -- even though they had fully disclosed it to the bureau and held top-level security clearances.

Pauley, Grapp reported to Hoover, was "most appreciative" of the information on his opponents.

In an interview, DeLoach denied that the FBI had attempted to remove Kerr, professors or students from the university. Grapp, however, confirmed that he leaked the information to Pauley.

Pauley was determined to oust Kerr.

And as he saw it, according to Grapp's report, UC would remain in turmoil "as long as the current officials were in power at the university."

**A political impasse**

The situation at UC Berkeley seemed to be going from bad to worse.

No sooner had the Free Speech Movement quieted down than the Filthy Speech Movement erupted in early March 1965. Police arrested a young man for sitting on the Sproul Hall steps and displaying a sign whose sole content, as Hoover put it in a letter to President Johnson, was "a four letter word not utilized by people of good taste in mixed company."

The arrest led to more profanity, arrests and protests. Some angry regents demanded that Kerr immediately expel the students, but the president insisted on following established disciplinary procedures.

Under increasing pressure, Kerr suddenly announced his intent to resign on March 9, 1965. But Gov. Brown and the Berkeley faculty backed Kerr, and a divided Board of Regents persuaded him to stay.

Regents Roth and Dutton, a former assistant U.S. secretary of state and also a longtime supporter of Brown and Kerr, still wanted to know who was behind the continuing campus unrest.

On May 20 they requested an FBI briefing on "communist participation in the student riots." But DeLoach denied their request on the grounds that Dutton wanted to use it to brief the entire board and "was not authorized to receive information from our files." DeLoach added in a memo, "I told him of the confidential nature of our files."

In an interview, Dutton said he never asked the FBI for information on the protests.

Meanwhile, the Vietnam Day Committee (VDC) had begun using the Berkeley campus to organize some of the nation's largest anti-war protests.

Through the summer of 1965, VDC leader Jerry Rubin and other protesters tried to block troop trains passing through Berkeley to the Oakland Army base.

That fall, thousands of students joined the escalating protests.

To Pauley and the FBI, it was further proof that Kerr had lost control of the university.

Pauley confided to Grapp that two alumni were taking things into their own hands. They had recruited athletes to "beat up the demonstrators" and hired a barber to "forcibly 'shear' the students who need it."

In an interview, Grapp said he did not know if the alumni carried out their plan.

Grapp continued to slip Pauley anonymous memos about students and faculty -- at least two dozen more -- that he could use in persuading the regents to fire Kerr.

But in October, a frustrated Pauley told Grapp he was still "two votes short to fire Clark Kerr."

FBI headquarters had come to realize that the problem was Gov. Brown.

"Governor Pat Brown has injected himself into the move on the part of

some of the Regents to oust Kerr," one of Hoover's top aides wrote on Oct. 28, 1965. "He regards the issue as a political one and would do everything in his power to retain Kerr as President."

Kerr would remain in charge of the university, it seemed, as long as Brown remained governor.

™ © 2007 Hearst Communications Inc.



**SFGate**.com

**Quick Search**

[ GO ]

Advanced Search

▶ SFGate Home
▶ Today's Chronicle

▶ Sports
▶ Business
▶ Entertainment
▶ Food&Dining
▶ Travel

**News & Features**
▶ Opinion
▶ Politics
▶ Technology
▶ Crime
▶ Science
▶ Cars
▶ Small Business
▶ Weird News
▶ Polls
▶ Photo Gallery
▶ Video Reports
▶ Audio Slideshows
▶ Columnists
▶ Travel
▶ Lottery
▶ Obituaries
▶ Blogs

**Community Blogs**
By our readers for
our readers BETA

▶ Newspaper Ads

**Classifieds**
▶ Jobs
▶ Personals
▶ Real Estate
▶ Rentals
▶ Cars

**Regional**
▶ Traffic
▶ Weather
▶ Live Views
▶ Maps
▶ Bay Area Traveler
▶ Wine Country
▶ Reno & Tahoe
▶ Ski & Snow
▶ Outdoors
▶ Earthquakes
▶ Education
▶ Chronicle Watch
▶ Public Notices

**Entertainment**
▶ Food & Dining
▶ Wine
▶ 96 Hours
▶ Movies
▶ Music & Nightlife
▶ Events
▶ Performance
▶ Art
▶ Books
▶ Comics
▶ TV & Radio
▶ Search Listings

**the campus files** | A Chronicle Special Report

## The governor's race
Seth Rosenfeld, Chronicle Staff Writer

Sunday, June 9, 2002

**San Francisco Chronicle**

Campus Files Home

1. Introduction
2. FBI's Secret UC files
3. Trouble On Campus
4. Governor's Race
5. The Legacy -- Epilogue
6. The 17-Year Legal Battle
7. Where Are They Now?
▪ A Note On Sources

The FBI Files
▪ Censored and uncensored docs

Timeline
▪ 1945-1980
▪ 1961-1966
▪ 1966-1973

Galleries
▪ Decade of Student Protest
▪ An Era of Secrecy

With a fire crackling in the hearth behind him, Reagan faced the television camera and announced on Jan. 4, 1966, that he would run for governor of California.

To Hoover and other FBI officials who had been frustrated with Brown's and Kerr's failure to end the protests at UC, Reagan was a breath of fresh air.

Over the years, the bureau had taken note as the charismatic actor who wanted to star in "The FBI Story" transformed himself into a leading conservative spokesman.

Reagan had campaigned for Nixon against John F. Kennedy in 1960. The following year, Reagan told a conference of food executives in Chicago that the Communist Party "has ordered once again the infiltration" of the movie industry. "They are crawling out from under the rocks," he declared.

When Hoover saw a news story about Reagan's speech, he dispatched agents to question him. But the bureau's former informer backpedaled, admitting that he had no "first-hand information" about current subversives in Hollywood.

In 1962, Reagan raised money for a Southern California Republican congressman and John Birch Society member, John Rousselot.

That year, Reagan, as host of "General Electric Theater," produced a two-part television special about Marion Miller, who had infiltrated the Communist Party for the FBI and told all in a book, "I Was a Spy: The Story of a Brave Housewife."

Later in 1962, General Electric dropped Reagan from his $150,000 per year job as company representative, concluding his speeches had become too politically extreme. That year Reagan switched his voter registration to Republican.

But it was his hugely successful 1964 television fund-raising pitch on behalf of Sen. Barry Goldwater's presidential bid -- "A Time for Choosing" -- that thrust Reagan into the national spotlight.

When Goldwater lost to Johnson that November, Reagan became the darling of the nation's conservatives, some of whom were soon urging him to challenge Brown for the governorship.

And as the genial host of the "Death Valley Days" television show tested the political waters, giving talks around the state, it seemed someone always brought up UC Berkeley -- and Reagan quickly warmed to the issue.



Appearing at the Greater Los Angeles Press Club in January 1966, Reagan said he approved of the arrests of the Free Speech Movement protesters.

**Living**
►Health
►Home & Garden
►Gay & Lesbian
►Horoscope

**Resources**
►RSS Feeds
►My Feeds
►Search & Archives
►Feedback/Contacts
►Corrections
►Newsletters
►Promotions
►Site Index

**Advertising**
►Advertise Online
►Advertise in Print
►Place a Classified
►SF Gate Media Kit

**Newspaper**
►Advertise
►Chronicle
  In Education
►Contacts
►Chronicle Events
►FAQ
►Jobs at
  the Chronicle
►Submissions

**Subscriber
Service**
►Get Home Delivery
►Manage Account,
  Missed Delivery,
  Vacation Hold

"I'm sorry they did away with paddles in fraternities," he quipped.

Now, as Reagan formally entered the governor's race on Jan. 4, 1966, with his fireside chat, he made it clear that one of his major campaign issues would be the campus unrest at Berkeley.

"Will we allow a great university to be brought to its knees by a noisy, dissident minority? Will we meet their neurotic vulgarities with vacillation and weakness?" Reagan asked.

"Or will we tell those entrusted with administering the university we expect them to enforce a code based on decency, common sense and dedication to the high and noble purpose of the university?"

### 'Meet the Press'

Hoover's top aides took special note when Reagan appeared on Jan. 9, 1966, on NBC's "Meet the Press."

Reagan was asked why he hadn't disavowed the John Birch Society, a group known for its far-reaching conspiracy theories.

Robert Welch, the society's founder, contended President Eisenhower and other leading U.S. officials had been communists and traitors. The group claimed to have thousands of members nationally and chapters throughout Southern California.

Under pressure to clarify his stand on the society for months, Reagan had issued a press release saying he never was a member of the group and disagreed with Welch's "reckless and imprudent statements."

On "Meet the Press," Reagan said he had not condemned the society itself because the Burns committee had looked into the group and found "nothing of a subversive nature."

The FBI, Reagan added, "has found nothing requiring an investigation of the John Birch Society."

But FBI officials knew the bureau's files contained a potentially explosive memo.

In June 1960, an informer whom the FBI memo described as "reliable" reported that Reagan secretly belonged to the organization's Beverly Hills chapter. The chapter included actors John Wayne, Adolphe Menjou and Zasu Pitts, columnist Hedda Hopper and screenwriter Morrie Ryskind, the informer told the bureau.

FBI files obtained by The Chronicle do not show whether the bureau investigated the claim or whether it is true, and DeLoach said in an interview that he had "no idea" about its veracity.

John McManus, the current president of the John Birch Society, said Reagan never was a member of the group. Wayne, Menjou and Ryskind were involved with the society, he said, adding he did not know whether Hopper and Pitts were.

Lyn Nofziger, Reagan's press secretary during the 1966 campaign, said Reagan had no relationship with the society and avoided any appearance of a connection because "I thought it would have cost us votes."

But the bureau kept the informer's report safely locked away.

Overall, FBI officials noted of the "Meet the Press" show, "Reagan made a good appearance and was quite quick and witty in answering the

numerous questions put to him which could have been considerably
embarrassing to his future political ambitions."

### 'A leadership gap'

Reagan took the stage at San Francisco's Cow Palace on May 12, 1966.
Standing beneath a huge American flag, he told the cheering crowd, the
biggest of his campaign so far, that the latest report from the Burns
committee was further proof that Kerr and Brown had to go.

The 153-page report accused Kerr of fostering an "anything goes"
atmosphere that had turned the university into a haven for protesters and
sex deviants.

The May 6 study, prepared by Combs, blamed the litany of campus
problems on Kerr's long-standing refusal to cooperate with the Burns
committee's "contact man" program to screen out "subversive" faculty.

Once again the Burns committee report ignited inflammatory headlines in
Bay Area papers, such as "Report Says U.C. 'Base for Reds' " and
"Senators Zero In on 'Filth.' "

Kerr hastily held a press conference and blasted the study as riddled with
"distortions, half-truths and statements and situations taken out of
context."

But Reagan seized on the thin red report to bolster his own charges of
campus misconduct.

At the Cow Palace, he declared, "There is a leadership gap, and a morality
and decency gap, in Sacramento. And there is no better illustration of that
than what has been perpetrated . . . at the University of California at
Berkeley, where a small minority of beatniks, radicals and filthy speech
advocates have brought such shame to . . . a great university."

Claiming his sources had verified allegations in the report, Reagan
demanded the dismissal of those responsible for "the degradation" of the
University of California.

And he called for legislative hearings, saying, "This report cannot be swept
under the rug."

### Sources on campus

Reagan's car pulled up at the Piedmont home of Republican
Assemblyman Don Mulford later that summer, and the candidate was
ushered inside for a secret meeting.

Reagan had easily defeated San Francisco Mayor George Christopher in
the June 7 GOP primary and was running all out against Brown.

But he broke from his intense campaign schedule for a two-hour meeting
with Mulford, a longtime critic of Kerr and "special contact" of the San
Francisco FBI.

Mulford had summoned to his home several university officials who
despised Kerr and had been secretly feeding the FBI internal university
information that, they believed, showed Kerr not only had tolerated
campus dissent but might be subversive himself.

Among those at the August meeting were Alex Sherriffs, former vice
chancellor at Berkeley; Hardin Jones, assistant director of UC's radiation
lab; and John Sparrow, associate general counsel to the regents.

Sherriffs, who had bitterly opposed Kerr's handling of the Free Speech Movement, had steadily supplied the FBI with information from personnel files about students and professors involved in campus protests.

Jones had been a paid FBI informant and had helped the FBI set up a network of campus sources to gather allegations that went into FBI reports about campus demonstrations and Kerr. He had told the FBI he was working with the Burns committee "towards removing President Kerr." But Jones' claims about campus communism eventually became so exaggerated that the bureau began to doubt his credibility and stopped paying him.

Sparrow had contacted the FBI at Jones' suggestion after becoming disgusted with Kerr's handling of campus unrest. Sparrow confidentially gave information to the FBI -- as well as the Burns committee -- about campus unrest.

In an interview, Sparrow confirmed the meeting and acknowledged he was engaging in partisan activity against Kerr. He said he took the "extraordinary" actions against a member of the board he represented because he was concerned about the "welfare" of the university.

During their meeting at Mulford's, the three men briefed Reagan about "communist efforts to influence the students" at Berkeley. And they told Reagan that Kerr's removal was "vital" to the university's future.

Afterward, Reagan thanked Mulford for "a most interesting meeting.

"I very much appreciate the help of yourself and your associates in providing the true facts on this matter," Reagan wrote in an Aug. 17 letter.

**A letter from Hoover**

A week later, Hoover gave Reagan's campaign a boost when he endorsed the candidate's proposal to set up a new police training academy.

On Aug. 20, 1966, Reagan had announced his plan for a new anti-crime academy that would teach "police, sheriff's deputies and other law officers the newest methods in crime prevention and solution."

The academy would be located in Berkeley. And "with Mr. Hoover's help," Reagan said, "such a school could become a sort of FBI academy of California."

Reagan already had written the director to solicit his help.

"Because of your long record, not only of successfully fighting crime, but also of developing new techniques and methods, and because you have given the United States a crime-fighting force second to none in the world, we are eager to have your aid and advice in this project."

But there was a problem: Hoover had previously made clear that he did not support candidates for elective office.

"It is and always has been my firm policy to refrain from lending support to any candidate in campaigns for political office," he had said only a few months before.

But in Reagan's case, the director was making an exception.

"I can assure you that this Bureau is always willing to extend its cooperative services to any and all local, state and federal agencies in order to more effectively combat crime," the director replied in an Aug. 24, 1966, letter.

"I hope you will not hesitate to call upon the FBI for assistance in all matters of mutual interest."

DeLoach denied the FBI helped Reagan's campaign.

"Heavens no," he said. "We stayed 10 miles away from political campaigns. Why should a fact-finding investigative agency involve themselves in political campaigns?"

### Ex-CIA leader joins campaign

Shortly after Labor Day, Reagan launched the final two months of his campaign with a new attack on Berkeley -- this time vowing to conduct a formal investigation of the campus protests with help from former CIA Director John McCone.

McCone had resigned from the CIA in April 1965 and joined Reagan's campaign in August 1966 as head of an executive policy advice committee.

In a major campaign address on Sept. 9, 1966, Reagan struck at both Kerr and Brown.

"I charge that there has been political interference, which has resulted in the appeasement of campus malcontents and filthy speech advocates under the pretense of preserving academic freedom.

"We must have a fair and open inquiry and we must maintain academic freedom for the university and keep it isolated from political influence.

"As governor, I will ask the most qualified man in California and the nation -- John McCone -- to conduct such an inquiry."

### The Reagan landslide



On Nov. 8, 1966, Reagan defeated Brown by nearly 1 million votes, leading a Republican sweep of the major state offices that instantly made him a national political figure.

The next day, Hoover wrote Reagan:

"Heartiest congratulations upon your election as Governor of California," he said. "Your many friends in this Bureau join me in the hope that your term in office will meet with every success, and we want you to feel free to let us know whenever we can be of service."

Lynum wrote Reagan on Nov. 14:

"May I convey my heartiest congratulations. . . . If we can be of any service in matters of mutual interest . . . please feel free to call on me."

Three days later, Grapp also wrote him:

"My associates in the Los Angeles Division of the FBI join me in extending to you best wishes for continued success and want you to know of our desire to assist you in any way possible."

In interviews, Lynum and Grapp said their letters were merely pro forma.

### A message from Mulford

The same day, Mulford arrived at FBI headquarters in Washington, D.C., with a proposal.

Mulford, who was helping the governor-elect select members of his administration, urged FBI officials to take advantage of Reagan's election and "exploit the opportunity . . . to have Governor Reagan clean out the left-wing elements" at the University of California.

Reagan was setting up a committee under Phil Battaglia, who had been his campaign chairman and was now his chief of staff, and Mulford wanted to know if the bureau could give Battaglia information "to assist Governor Reagan in identifying communists and other left-wing extremists.

"The purpose will be either to eliminate them from the state government or to prevent their receiving an appointment to a state position," Mulford told a senior agent on Nov. 17, 1966. "Reagan is planning to clean up the University of California at Berkeley."

Battaglia, now a Southern California lawyer whose clients include the Hearst Corp., said he did not recall the matter.

The agent concluded his meeting with Mulford by giving him the FBI's stock reply: "The FBI could not be placed in the position of 'clearing' appointees to state positions."

But within a week, the director alerted all California FBI offices to Mulford's proposal:

"In the event that you, or another of the California offices is contacted by Reagan or one of his assistants regarding this matter," Hoover wrote, "the Bureau should be immediately advised of the details and no commitments should be made until instructions are received from the Bureau."

## Reagan's denial

But the FBI had a problem.

As governor, Reagan would have access to UC's atomic research data. The Atomic Energy Act required the FBI to conduct a comprehensive background investigation of him.

The process started on Dec. 18, 1966, when Reagan filled out a Personnel Security Questionnaire that asked, among other questions:

"Are you now, or have you ever been, a member of any organization which has been designated by the United States Attorney General as required under the provisions of Executive Order 10450?

"Are you now, or have you ever been, a member of any foreign or domestic organization, association, movement, group, or combination of persons which is totalitarian, fascist, communist, or subversive . . . ?"

Applicants were required to list any such groups and the dates they were involved with them.

Reagan answered "no" to both questions on the form, which contained a warning that "any false statement herein may be punished as a felony."

Reagan received shining recommendations from everyone the FBI interviewed.

But files of the Los Angeles FBI office showed that in 1946 Reagan had been a sponsor and director of the Committee for a Democratic Far East Policy, which had been designated as subversive by the U.S. Attorney General under Executive Order 10450.

The records also showed that also in 1946 Reagan had been a member of

the American Veterans Committee, the California section of which had been cited in a report by the predecessor of the Burns committee as "communist dominated and (as) a vociferous, decadent minority in national AVC affairs."

But Grapp, head of the L.A. office, approved a report that conformed to Reagan's Personnel Security Questionnaire -- omitting Reagan's association with the two groups officially deemed subversive.

When FBI officials in the bureau's headquarters read Grapp's report, they ordered him to amend the document to include Reagan's role in the groups.

The bureau could not risk the omission. Hundreds of people in the late 1940s and early 1950s had faced hearings and sometimes dismissals from federal employment for failing to disclose memberships in groups deemed subversive.

But the final report to the Atomic Energy Commission, prepared by FBI headquarters, did not mention Reagan's false statement that he had never belonged to a subversive organization, which by law could itself be reason to deny a security clearance.

Battaglia said he did not recall Reagan's security clearance application.

Meese, who joined the administration after Reagan signed the form, said he did not know why Reagan denied his past association with the groups.

DeLoach denied that the FBI gave Reagan special treatment in preparing the report.

But Grapp and another former agent told The Chronicle it was standard procedure for the FBI to point out discrepancies between an applicant's sworn statement and the bureau's findings.

"Yeah, sure, they'd put that in," Grapp said.

Inauguration warning

On Jan. 5, 1967, Reagan was sworn in as governor of California. In an inaugural address delivered on the steps of the state Capitol, he warned UC students to obey the rules or get out.

Nine days later, Reagan's office phoned Lynum and said Reagan was scheduled to meet with Kerr about "the Berkeley situation" in two days. Reagan wanted to meet with FBI officials beforehand.

The new governor was furious with Kerr, according to an FBI memo: Reagan's plan to cut the budget for higher education and impose tuition for the first time had leaked to the press. In response, Kerr had announced he would freeze early admissions to the university. New campus protests erupted and students burned Reagan in effigy.

Lynum hung up the phone after speaking with Lt. Gov. Robert Finch and immediately called FBI headquarters.

He urged the bureau to be cautious and not to meet with Reagan at that time. He suggested instead referring the new governor to "former university officials and others who are fully aware of the Berkeley situation."

An hour later, headquarters called Lynum back.

He was to meet with Reagan.

### A bedside meeting

Lynum and Glenn Harter, his top domestic security agent, were led into Reagan's master bedroom in the governor's mansion in Sacramento on Jan. 16, 1967.

The flu-stricken Reagan had canceled the meeting he had scheduled with Kerr for that afternoon, but he still wanted to speak with the FBI about Berkeley.

Reagan's top aides were gathered around his king-size bed. But after perfunctory introductions, Lynum reminded the governor that Hoover had authorized only a private meeting.

Reagan looked around the room.

"Well, you heard him, boys," he said, Lynum told The Chronicle.

After agreeing that their conversation would be held in strict confidence, Lynum and Harter gave Reagan a 45-minute briefing about the turmoil at UC. "I told him what I knew," Lynum said.

But Reagan also wanted a wide range of intelligence from the bureau.

"Governor Reagan specifically requested any information on University President Clark Kerr, any subversive information on any of the University Regents and any information the FBI developed indicating a demonstration was to be held on the campus or at press conferences," an FBI memo said.

Some of his press conferences, the governor explained, could be "stacked with 'left wingers' who might make an attempt to embarrass him and the state government."

Reagan also asked for advance information on "any demonstrations against him or the university administrations."

As Hoover had instructed, Lynum made no commitments. He told Reagan the bureau had not investigated the university and referred Reagan to the Burns committee's most recent report about subversive activities on campus.

Then he and Harter returned to San Francisco and sent an urgent report to the director.

### Hoover plan

Hoover seized the chance to help Reagan clean up Berkeley.

"This presents the Bureau with an opportunity to take positive steps to thwart the ever increasing agitation by subversive elements on the campuses," he noted on a memo to his aides.

"Agitators on other campuses take their lead from activities which occur at Berkeley.

"If agitational activity at Berkeley can be effectively curtailed, this could set up a chain reaction which will result in the curtailment of such activities on other campuses throughout the United States," Hoover noted.

"Reagan is obviously determined to take appropriate action to quell the unrest on the Berkeley campus."

In an interview, DeLoach said, "Mr. Hoover obviously felt that Gov. Brown

was not putting up a strong stand" against the campus unrest because of his "being friendly with Kerr." DeLoach added, "Consequently later on, (Hoover) felt friendly towards Reagan and dealt with him -- but not with Brown and Kerr."

Hoover wanted to help Reagan, but was concerned that the FBI's role might be exposed. So in his customary blue ink, the director outlined a plan that would not leave a paper trail leading back to the bureau.

According to the plan, Lynum would warn Reagan about any future protests at Berkeley or at his press conferences. But officially, he would tell Reagan the FBI had "no pertinent information" about Kerr or the regents.

Instead, senior FBI official Charles Brennan, who "has the qualifications and ability to handle this sensitive matter," would confidentially brief Reagan.

"We cannot furnish the governor anything else," Hoover said. "We do not know him well enough and we would possibly be involved in an academic war."

### The showdown



Three days later, on Jan. 20, 1967, while Savio and others demonstrated outside University Hall against Reagan's proposal to impose tuition, Reagan arrived for his first regents meeting.

Reagan's election as governor had dramatically shifted the balance of power on the board. Three of Kerr's staunchest defenders, including Brown, were replaced by Reagan, Finch and Allan Grant, Reagan's new state Department of Agriculture chief.

The morning of the meeting, Kerr had met privately with board chairman Theodore Meyer, a San Francisco lawyer, and vice chair Dorothy Chandler, wife of Los Angeles Times publisher Otis Chandler, to clarify his future as university president.

If the regents were going to fire him, they should do it now, Kerr told them, since as a lame duck he would be ineffective in negotiating the budget with the state Legislature.

In a second meeting, Meyer and Chandler asked Kerr to resign. Kerr said in an interview, but he refused. The university was constitutionally independent, he told them, and he did not want to contribute to the idea that each new governor had the right to pick a president.

Reagan arrived after noon. During the campaign he had vowed to fire Kerr, but his former aides told The Chronicle that he planned to wait several months so the dismissal would not look purely political.

Kerr's refusal to resign, however, had forced a showdown. And after the governor joined the meeting, Kerr left the room.

For the next two hours, the regents discussed Kerr. Finally, Grant made a motion to fire Kerr. When other regents noted that Grant's motion might appear to be politically motivated, Laurence Kennedy Jr., a Redding attorney who had been appointed by Brown, moved to fire Kerr.

Thirteen votes were needed.

The vote was 14-8.

### An invitation

Soon after Kerr's firing, Reagan wrote Hoover saying he was pleased to learn the FBI was opening a Sacramento office.

"This will more ably assist all of us in our continuing fight against crime and subversion. . . . I am vitally interested in doing everything I can to combat the moral decay as shown by our rising crime rate in our country today, . . ." Reagan's Feb. 27, 1967, letter said. "Please accept my personal assurance that your agency will have the most complete cooperation possible from my office."

In a handwritten note, Reagan added, "P.S. I've just always felt better knowing your men are around."

On March 7, 1967, Hoover replied, "I do hope you will not hesitate to call on upon us whenever we can be of service . . . . I share your confidence that a great deal can be accomplished by working together."

### Crackdown on campus

Reagan had made a campaign pledge to impose order on campus, and he meant to keep it.

The new governor quickly took a much more hands-on approach to the university than did Brown, scrutinizing not just the university's budget but course content and faculty appointments.

And the FBI began providing his administration with information about campus protests and background reports on prospective university employees.

On Jan. 18, 1968, Hoover met with Reagan and his legal affairs secretary, Edwin Meese III, at FBI headquarters. Afterward, Hoover wrote, "The Governor called to . . . renew his friendship. We discussed generally some of the problems which the Governor has had to face up to at the University of California and his determination to see that law and order are maintained there."

But protests at UC Berkeley and campuses across the nation intensified in opposition to the war in Vietnam and the draft.

And in May 1969, violence erupted over the university's plan to build dormitories on a vacant lot near the Berkeley campus known as People's Park.

Reagan placed the entire city under martial law and dispatched tear gas-spraying helicopters and riot police who shot and killed one man and wounded others. Several officers also were injured. Hundreds of people were arrested.

Two months later, Herbert E. Ellingwood, one of Reagan's top legal advisers, met with DeLoach at FBI headquarters.

In the July 17, 1969, meeting, Ellingwood bluntly expressed the Reagan administration's frustration with protests and the university officials handling them.

Still, he said, "Governor Reagan is dedicated to the destruction of disruptive elements on California campuses."

The Reagan administration "will attack these groups" through several methods, Ellingwood said. These included "hounding the groups as much as possible by bringing any form of violation available against them." For example, he said, "if any of these groups has a bookstore on campus they will bring building code violations against them."

Reagan officials also may refer "tax violations (of the dissenters) both to the Internal Revenue Service of the State of California and to the Federal Internal Revenue Service."

Finally, the administration would mount a "psychological warfare campaign," said Ellingwood, adding that he would "confer with Department of Defense officials today to get ideas from those individuals as to how to conduct campaigns of this nature."

Meese told The Chronicle, "I have no recollection at all of us planning to do these things. . . . There was never any concentrated strategy to do these things."

As Ellingwood ended his meeting with DeLoach, he asked if the FBI would give Reagan more intelligence reports.

Hoover swiftly agreed.

"This has been done in the past," the director noted, "and has worked quite successfully."

™ © 2007 Hearst Communications Inc.



**SFGate.com**

**the campus files**                               A Chronicle Special Report

**Quick Search**

GO

Advanced Search

▸SFGate Home
▸Today's Chronicle

▸Sports
▸Business
▸Entertainment
▸Food&Dining
▸Travel

**News & Features**
▸Opinion
▸Politics
▸Technology
▸Crime
▸Science
▸Cars
▸Small Business
▸Weird News
▸Polls
▸Photo Gallery
▸Video Reports
▸Audio Slideshows
▸Columnists
▸Travel
▸Lottery
▸Obituaries
▸Blogs

**Community Blogs**
By our readers for
our readers **BETA**

▸Newspaper Ads

**Classifieds**
▸Jobs
▸Personals
▸Real Estate
▸Rentals
▸Cars

**Regional**
▸Traffic
▸Weather
▸Live Views
▸Maps
▸Bay Area Traveler
▸Wine Country
▸Reno & Tahoe
▸Ski & Snow
▸Outdoors
▸Earthquakes
▸Education
▸Chronicle Watch
▸Public Notices

**Entertainment**
▸Food & Dining
▸Wine
▸96 Hours
▸Movies
▸Music & Nightlife
▸Events
▸Performance
▸Art
▸Books
▸Comics
▸TV & Radio
▸Search Listings

## The legacy of the FBI's UC activities

Seth Rosenfeld, Chronicle Staff Writer                Sunday, June 9, 2002

*San Francisco Chronicle*

In spring 1970, anti-war protests peaked when President Nixon told the nation that U.S. troops had invaded Cambodia. More than 400 universities were shut or on strike.

On May 4, National Guardsmen called to quell protests at Kent State University in Ohio shot and killed four students. On May 15, two students protesting the war were shot and killed at Jackson State College in Mississippi.

Only as the United States began a complete withdrawal from Vietnam would the waves of campus protest recede.

On May 2, 1972, J. Edgar Hoover died of a heart attack at age 77, after 48 years as FBI director. In an internal memo the year before his death, he expressed profound fear of the Freedom of Information Act, which had gone into effect five years earlier.

"I sense utter fright as to the Freedom of Information Act," Hoover wrote, worried that the law would open bureau files to "every 'kook,' 'jackal' and 'coyote.' "

Reagan, 91, lives in Los Angeles. After mid-1970s congressional hearings exposed unlawful FBI spying on citizens, he came to the bureau's defense, charging in a June 1977 radio talk that the FBI was being treated "as if it were some kind of secret police." Elected president in 1980, Reagan narrowed the FOIA and broadened FBI intelligence operations. A few years later, the FBI was caught spying on more than 100 domestic groups that opposed Reagan's foreign policy.

Clark Kerr, 91, lives in El Cerrito. After his dismissal as UC president — and the FBI's misleading background report about him -- he never received another White House appointment. He worked as an educational consultant, had the Clark Kerr Campus at UC Berkeley named for him and published a memoir.

In the late 1970s he requested his FBI files under the FOIA, but the bureau did not release them to him. Until he was contacted by The Chronicle, he said, Kerr was unaware of any of the FBI's unlawful campus activities or its campaign to fire him.

*E-mail Seth Rosenfeld at srosenfeld@sfchronicle.com.*

™ © 2007 Hearst Communications Inc.

Campus Files Home

1. Introduction
2. FBI's Secret UC files
3. Trouble On Campus
4. Governor's Race
5. The Legacy – Epilogue
6. The 17-Year Legal Battle
7. Where Are They Now?
▸ A Note On Sources

The FBI Files
▸ Censored and uncensored docs

Timeline
▸ 1945-1960
▸ 1961-1965
▸ 1966-1973

Galleries
▸ Decade of Student Protest
▸ An Era of Secrecy

**Living**
>Health
>Home & Garden
>Gay & Lesbian
>Horoscope

**Resources**
>RSS Feeds
>My Feeds
>Search & Archives
>Feedback/Contacts
>Corrections
>Newsletters
>Promotions
>Site Index

**Advertising**
>Advertise Online
>Advertise in Print
>Place a Classified
>SF Gate Media Kit

**Newspaper**
>Advertise
>Chronicle
 In Education
>Contacts
>Chronicle Events
>FAQ
>Jobs at
 the Chronicle
>Submissions

**Subscriber
Service**
>Get Home Delivery
>Manage Account,
 Missed Delivery,
 Vacation Hold



**the campus files**  |  A Chronicle Special Report

## The 17-year legal battle to get the campus files

Seth Rosenfeld, Chronicle Staff Writer

Sunday, June 9, 2002
San Francisco Chronicle

Campus Files Home

1. Introduction
2. FBI's Secret UC files
3. Trouble On Campus
4. Governor's Race
5. The Legacy — Epilogue
6. The 17-Year Legal Battle
7. Where Are They Now?
- A Note On Sources

The FBI Files
- Censored and uncensored docs

Timeline
- 1945-1980
- 1981-1985
- 1966-1973

Galleries
- Decade of Student Protest
- An Era of Secrecy

**SFGate.com**

Quick Search

[ GO ]

Advanced Search

▸SFGate Home
▸Today's Chronicle

▸Sports
▸Business
▸Entertainment
▸Food&Dining
▸Travel

**News & Features**
▸Opinion
▸Politics
▸Technology
▸Crime
▸Science
▸Cars
▸Small Business
▸Weird News
▸Polls
▸Photo Gallery
▸Video Reports
▸Audio Slideshows
▸Columnists
▸Travel
▸Lottery
▸Obituaries
▸Blogs

**Community Blogs**
By our readers for
our readers  BETA

▸Newspaper Ads

**Classifieds**
▸Jobs
▸Personals
▸Real Estate
▸Rentals
▸Cars

**Regional**
▸Traffic
▸Weather
▸Live Views
▸Maps
▸Bay Area Traveler
▸Wine Country
▸Reno & Tahoe
▸Ski & Snow
▸Outdoors
▸Earthquakes
▸Education
▸Chronicle Watch
▸Public Notices

**Entertainment**
▸Food & Dining
▸Wine
▸96 Hours
▸Movies
▸Music & Nightlife
▸Events
▸Performance
▸Art
▸Books
▸Comics
▸TV & Radio
▸Search Listings

The FBI spent more than 15 years and $1 million trying to suppress records revealing its unlawful covert activities at the University of California and its campaign to fire then-UC President Clark Kerr.

In 1981, Chronicle reporter Seth Rosenfeld, then a journalism student at UC Berkeley, sent the FBI a Freedom of Information Act request for "any and all" records on more than 100 people, events and groups involved in controversies at UC over academic freedom, civil rights and national policy.

The FOIA requires federal agencies to release public records in a timely way, so people know "what their government is up to." But the bureau refused to comply with the request. Only after a protracted legal fight that reached the U.S. Supreme Court did the FBI agree to release the withheld information.

Totaling more than 200,000 pages, those papers constitute one of the single largest releases of FBI records under the FOIA. In court, the bureau estimated it cost more than $900,000 to process the request.

Many of those documents are the basis for today's story.

The released documents provide dramatic before-and-after examples of the FBI's attempts to cover up unlawful intelligence activities:

· The FBI excised much of a July 17, 1969, memo titled "New Left and Extremist Movements," on law enforcement grounds. The uncensored memo reveals that a top Reagan aide was discussing the governor's plans for "the destruction of disruptive elements on California college campuses" through "psychological warfare" and other methods.

· The FBI at first deleted parts of a Jan. 16, 1967, teletype concerning a confidential request from Gov. Reagan for bureau information, claiming the deleted information concerned law enforcement. The fully released memo shows Reagan wanted political information on Kerr and UC regents.

· The FBI initially blacked out most of an Oct. 16, 1958, memo on the grounds that the deleted parts concerned a "law enforcement purpose." The fully released version shows the document actually concerned a plot to get Kerr fired because he was too liberal.

Other examples of once-secret FBI documents can be seen at sfgate.com/campus. Obstacles of fees, censorship.

Initially, the FBI refused to comply with Rosenfeld's 1981 request until he agreed to pay thousands of dollars for processing the records. Thomas Steel, the late San Francisco constitutional lawyer, agreed to take the case pro bono and in 1985 sued for a waiver of the fees.

The FBI still refused, claiming release of the records would be of little

**Living**
›Health
›Home & Garden
›Gay & Lesbian
›Horoscope

**Resources**
›RSS Feeds
›My Feeds
›Search & Archives
›Feedback/Contacts
›Corrections
›Newsletters
›Promotions
›Site Index

**Advertising**
›Advertise Online
›Advertise in Print
›Place a Classified
›SF Gate Media Kit

**Newspaper**
›Advertise
›Chronicle
  In Education
›Contacts
›Chronicle Events
›FAQ
›Jobs at
  the Chronicle
›Submissions

**Subscriber
Service**
›Get Home Delivery
›Manage Account,
  Missed Delivery,
  Vacation Hold

benefit to the public. But in 1985, U.S. District Judge Marilyn Hall Patel concluded that the FBI's denial of a fee waiver was "arbitrary and capricious."

Patel ordered the bureau to waive all processing costs, ruling that Rosenfeld had "persuasively demonstrated . . . that his research requires meticulous examination of record(s) that may not on their face indicate much to an untrained eye."

Patel also ordered the FBI to release about 5,000 pages on Kerr and several other subjects -- but the bureau redacted thousands more documents, sometimes blacking out whole pages. The FBI claimed it had censored the records to protect law enforcement operations, personal privacy and national security.

So Rosenfeld filed a second lawsuit in 1985, challenging the redactions.

In 1988, then-U.S. Magistrate Claudia Wilken concluded that many of the FBI's deletions "were not well taken" and the information should be released.

The FBI challenged the ruling. The bureau claimed it had legal ground to investigate the FSM to determine whether it was influenced by communists and posed a threat to civil order.

In 1991, Patel adopted the magistrate's report with only minor changes. Patel ruled that Rosenfeld had presented "highly persuasive" evidence -- including the FBI's own records -- showing that the bureau's initially lawful investigation of the FSM later turned into political spying.

Patel also ruled that the FBI's files showed the bureau had investigated Kerr unlawfully.

The FBI even fought to keep secret information that already was public, the judge said, noting "these circumstances raise serious doubt about the care and good faith in which defendants have processed these requests."

The FBI asked Patel to reconsider her decision. She said no.

FBI's many appeals

The bureau appealed to the U.S. Court of Appeals for the Ninth Circuit. The FBI argued that judges have no authority to question whether FBI records concern legitimate law enforcement and that courts must therefore defer to the bureau's decisions to keep information secret -- a position that would have gutted the FOIA.

But in a 1995 decision by Judge Melvin Brunetti, the appeals court affirmed virtually all of Patel's opinion.

In the Free Speech Movement case, the appeals court said FBI memos "strongly" suggested the bureau sought to "harass political opponents of the FBI's allies among the Regents, not to investigate subversion and civil disorder."

In Kerr's case, the court said the records showed that "the FBI waged a concerted effort in the late 1950s and 1960s to have Kerr fired from the presidency of UC."

Those documents, the court added, "strongly support the suspicion that the FBI was investigating Kerr to have him removed from the UC administration, because FBI officials disagreed with his politics or his handling of administrative matters."

The FBI asked the court to reconsider the ruling. The court declined. The

FBI then asked the entire Ninth Circuit, which comprises appeals judges throughout the western states, to reconsider. No judge agreed.

By now, five federal judges had ruled that the FBI repeatedly violated the FOIA by withholding records related to its campus operations.

Nonetheless, in 1995, the FBI asked the U.S. Supreme Court to review the decision. Before the high court acted, however, the FBI and Rosenfeld settled the case.

To promote government accountability, the FOIA requires that federal agencies pay the legal fees of plaintiffs who prove information was wrongly withheld. So the FBI incurred not only its own legal costs for trying to keep the records secret, but also paid Steel more than $600,000 in legal expenses.

The 1996 settlement left the Ninth Circuit ruling on the books to help other requesters seeking public records.

More records remain unseen

The settlement also resolved a third suit filed by Rosenfeld in 1990 to force the FBI to release the rest of the records in a timely way.

The FBI claimed it was diligently handling the request, but Patel found that the FBI had engaged in "deliberate . . . delay." The court concluded, "At the FBI's current rate, processing of plaintiff's FOIA request will take 40 years."

The FBI has yet to finish turning over the last of the records, said James Wheaton, the Oakland lawyer now handling the case.

Meanwhile, Attorney General John Ashcroft has announced a new policy under which the U.S. Department of Justice will defend federal agencies that seek to withhold records under the FOIA.

Lucy Dalglish, executive director of the Reporters Committee for Freedom of the Press, said the policy will make it harder for citizens to get federal records, particularly when the government makes claims of national security.

™ © 2007 Hearst Communications Inc.



SFGate.com

Quick Search

[ GO ]

Advanced Search

▸SFGate Home
▸Today's Chronicle

▸Sports
▸Business
▸Entertainment
▸Food&Dining
▸Travel

News & Features
▸Opinion
▸Politics
▸Technology
▸Crime
▸Science
▸Cars
▸Small Business
▸Weird News
▸Polls
▸Photo Gallery
▸Video Reports
▸Audio Slideshows
▸Columnists
▸Travel
▸Lottery
▸Obituaries
▸Blogs

Community Blogs
By our readers for
our readers  BETA

▸Newspaper Ads

Classifieds
▸Jobs
▸Personals
▸Real Estate
▸Rentals
▸Cars

Regional
▸Traffic
▸Weather
▸Live Views
▸Maps
▸Bay Area Traveler
▸Wine Country
▸Reno & Tahoe
▸Ski & Snow
▸Outdoors
▸Earthquakes
▸Education
▸Chronicle Watch
▸Public Notices

Entertainment
▸Food & Dining
▸Wine
▸96 Hours
▸Movies
▸Music & Nightlife
▸Events
▸Performance
▸Art
▸Books
▸Comics
▸TV & Radio
▸Search Listings

## the campus files

A Chronicle Special Report

### Where are they now?
### Other key players
Seth Rosenfeld, Chronicle Staff Writer

Sunday, June 9, 2002

San Francisco Chronicle

Campus Files Home

1.  Introduction
2.  FBI's Secret UC files
3.  Trouble On Campus
4.  Governor's Race
5.  The Legacy – Epilogue
6.  The 17-Year Legal Battle
7.  Where Are They Now?
•   A Note On Sources

The FBI Files
•   Censored and
    uncensored docs

Timeline
•   1945-1960
•   1961-1965
•   1966-1973

Galleries
•   Decade of Student Protest
•   An Era of Secrecy

· **Richard Auerbach:** The special agent in charge of the FBI's San Francisco office from 1959 to 1961, Auerbach was alarmed when UC Berkeley students joined in the protest against HUAC at City Hall. He retired in 1961 and died at age 78 in 1989.

**Charles Brennan:** The senior FBI official who was assigned to brief Reagan in 1967 on student protest at UC Berkeley became an assistant FBI director in charge of the domestic intelligence division. After retiring, he was a security consultant to the Mitre Corp. He died at age 77 in 2000.

**Hugh Burns:** The chairman of the state Senate Fact-Finding Subcommittee on Un-American Activities retired from the Senate after 34 years in 1970, campaigned for Governor Reagan's re-election and was appointed by Reagan to the state Alcoholic Beverage Control Appeals Board. He died at age 86 in 1988.

· **Richard Combs:** The longtime chief counsel to Burns' subcommittee on un-American activities retired from legislative staff in 1970 and served as a federal magistrate in Tulare County. He died at age 91 in 1995.

· **Cartha "Deke" DeLoach:** Hoover's third in command retired in 1970 and became a vice president of Pepsico. He is now affiliated with a South Carolina financial firm.

· **Herbert Ellingwood:** The former Alameda County assistant district attorney became Gov. Reagan's legal affairs adviser in 1969 and met with the FBI to discuss plans to fight student campus protest groups. He died at age 67 in 1998.

· **Wesley Grapp:** The head of the Los Angeles FBI office who carried out Hoover's orders to give FBI information to senior regent Edwin Pauley, Grapp retired from the FBI in 1972 and headed security for Flying Tigers Airlines. He is retired.

· **Everett Jones:** The UCLA professor whom the FBI wrongly suspected of writing an offensive essay question about the FBI, Jones co-authored a 1966 book called "The Adventures of the Negro Cowboys." He retired in 1982 and died at age 74 in 1990.

· **Hardin Jones:** The UC Berkeley physiologist who bitterly opposed student protests and worked with the Burns committee and the FBI in the 1960s, Jones wrote a book on the dangers of marijuana in the 1970s. He died of a heart attack at age 73 in 1978.

· **Curtis Lynum:** The special agent in charge of the San Francisco FBI office from 1963 to 1967, Lynum told Hoover communists were not behind the Free Speech Movement. After leaving the FBI in 1967 he was named by Reagan to the state Parole Board and is now retired.

· **John McCone:** The CIA director who had arranged for the FBI to give Regent Edwin Pauley reports on the political backgrounds of students, faculty and other regents, McCone advised President Reagan's Commission on Strategic Forces in the 1980s. He died at age 89 in 1991.

· **Edwin Meese III:** The assistant Alameda County district attorney who prosecuted the Free Speech Movement protesters became Gov. Reagan's legal affairs secretary and helped handle campus unrest before serving as

**Living**
▸Health
▸Home & Garden
▸Gay & Lesbian
▸Horoscope

**Resources**
▸RSS Feeds
▸My Feeds
▸Search & Archives
▸Feedback/Contacts
▸Corrections
▸Newsletters
▸Promotions
▸Site Index

**Advertising**
▸Advertise Online
▸Advertise in Print
▸Place a Classified
▸SF Gate Media Kit

**Newspaper**
▸Advertise
▸Chronicle
  in Education
▸Contacts
▸Chronicle Events
▸FAQ
▸Jobs at
  the Chronicle
▸Submissions

**Subscriber
Service**
▸Get Home Delivery
▸Manage Account,
  Missed Delivery,
  Vacation Hold

President Reagan's attorney general. He is a fellow at the Heritage Foundation in Washington, D.C.

· **Ed Montgomery:** The Pulitzer Prize-winning San Francisco Examiner crime reporter, who wrote stories alleging that the Free Speech Movement was a Marxist plot, retired in 1975. He died in St. Helena at age 82 in 1992.

· **Don Mulford:** The six-term California assemblyman from the East Bay, who helped arrange for the FBI to supply Governor Reagan with information on UC Berkeley students, faculty and administrators, retired from the Legislature in 1970 and served as state protocol officer. He died at age 84 in 2000.

· **Edwin Pauley:** The millionaire oilman, regent and UC donor who worked with the FBI to oust Kerr, Pauley retired from the Board of Regents in 1972 after 32 years. He died at age 78 in 1981.

· **Mario Savio:** The fiery spokesman for the 1964 Free Speech Movement dropped from sight for much of the 1970s, earned his bachelor of science and master's degrees in physics at San Francisco State University and taught at Sonoma State University. He died of a heart attack at age 53 in 1996.

· **Alex Sherriffs:** The UC Berkeley psychology professor and vice chancellor for student affairs served as Gov. Reagan's chief educational adviser from 1967 to 1973 and then as vice chancellor of the California State University and Colleges system. He is retired.

· **John Sparrow:** The associate general counsel to the UC regents during the early 1960s gave information about campus events to the FBI, the Reagan administration and the Burns committee. He is retired.

· **William Wadman:** The former UC security chief was the first university police officer to attend the FBI national academy and was a campus source for the bureau. He died at age 97 in 2000.

· **Jack Weinberg:** The former student whose arrest for distributing civil rights literature on campus ignited the Free Speech Movement, Weinberg also coined the slogan "Don't trust anyone over 30" and became a labor organizer and environmental activist. He is 62.

™ © 2007 Hearst Communications Inc.



**SFGate**.com

Quick Search

**GO**

Advanced Search

▸SFGate Home
▸Today's Chronicle

▸Sports
▸Business
▸Entertainment
▸Food&Dining
▸Travel

**News & Features**
▸Opinion
▸Politics
▸Technology
▸Crime
▸Science
▸Cars
▸Small Business
▸Weird News
▸Polls
▸Photo Gallery
▸Video Reports
▸Audio Slideshows
▸Columnists
▸Travel
▸Lottery
▸Obituaries
▸Blogs

**Community Blogs**
By our readers for
our readers **BETA**

▸Newspaper Ads

**Classifieds**
▸Jobs
▸Personals
▸Real Estate
▸Rentals
▸Cars

**Regional**
▸Traffic
▸Weather
▸Live Views
▸Maps
▸Bay Area Traveler
▸Reno & Tahoe
▸Ski & Snow
▸Outdoors
▸Earthquakes
▸Education
▸Chronicle Watch
▸Public Notices

**Entertainment**
▸Food & Dining
▸Wine
▸96 Hours
▸Movies
▸Music & Nightlife
▸Events
▸Performance
▸Art
▸Books
▸Comics
▸TV & Radio
▸Search Listings

## the campus files

A Chronicle Special Report

# A note on sources
Seth Rosenfeld, Chronicle Staff Writer

Sunday, June 9, 2002

San Francisco Chronicle

Campus Files Home

1. Introduction
2. FBI's Secret UC files
3. Trouble On Campus
4. Governor's Race
5. The Legacy – Epilogue
6. The 17-Year Legal Battle
7. Where Are They Now?
• A Note On Sources

    The FBI Files
• Censored and
  uncensored docs

    Timeline
• 1945-1960
• 1961-1965
• 1966-1973

    Galleries
• Decade of Student Protest

• An Era of Secrecy

"The Campus Files" special report is based on previously secret FBI records. All dialogue quoted in the story is taken from FBI memos, unless noted otherwise. The story is also based on:

Extensive interviews with current and former FBI agents, university officials, scholars and congressional investigators;

Material from official University of California records at the Bancroft Archives, Gov. Reagan's papers at the Ronald Reagan Presidential Library, papers of other Reagan staff and associates at the Hoover Institution at Stanford University, and oral histories of various regents and officials of the Brown and Reagan administrations that were conducted by the University of California oral history project;

"Final Report, Intelligence Activities and the Rights of the Americans, 1976, by the U.S. Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities," also known as the Church committee report.

The following books were especially useful in providing context for the FBI activities disclosed in the bureau's files:

On Reagan: "Nofziger," by Lyn Nofziger; "With Reagan: The Inside Story," by Edwin Meese III; "Reagan," by Lou Cannon; "Reagan's America: Innocents at Home," by Garry Wills; "Ronald Reagan, His Life and Rise to the Presidency," by Bill Boyarsky.

On UC Berkeley: "Berkeley at War: The 1960s," by W. J. Rorabaugh; "The Free Speech Movement: Coming of Age in the 1980s," by David Lance Goines; "The Beginning: Berkeley, 1964," by Max Heirich; and "The Gold and the Blue: A Personal Memoir of the University of California, 1949-1967," by Clark Kerr.

On the FBI: "From the Secret Files of J. Edgar Hoover" and "Chasing Spies," both by Athan Theoharis; "Hoover's FBI: The Inside Story," by Cartha DeLoach; "FBI and I: One Family's Life in the FBI During the Hoover Years," by Curtis Lynum; "The Life and Times of an FBI Agent," by Donald Kuno; "J. Edgar Hoover: The Man and the Secrets," by Curt Gentry; and "Secrecy and Power: The Life of J. Edgar Hoover," by Richard Powers; "The Age of McCarthyism: A Brief History With Documents," by Ellen Schrecker; and "Compromised Campus: The Collaboration of Universities with the Intelligence Community, 1945-1955," by Sigmund Diamond.

Two nonprofit foundations, the Deer Creek Foundation and the Stern Family Fund, provided grants that supported the early reporting of this project.

™ © 2007 Hearst Communications Inc.

**Living**
- Health
- Home & Garden
- Gay & Lesbian
- Horoscope

**Resources**
- RSS Feeds
- My Feeds
- Search & Archives
- Feedback/Contacts
- Corrections
- Newsletters
- Promotions
- Site Index

**Advertising**
- Advertise Online
- Advertise In Print
- Place a Classified
- SF Gate Media Kit

**Newspaper**
- Advertise
- Chronicle
  In Education
- Contacts
- Chronicle Events
- FAQ
- Jobs at
  the Chronicle
- Submissions

**Subscriber
Service**
- Get Home Delivery
- Manage Account,
  Missed Delivery,
  Vacation Hold

# Exhibit B

1  THOMAS STEEL
   JEFF BYRNE
2  STEEL, CLARENCE, BUCKLEY & SNELL
   301 Pennsylvania Avenue
3  San Francisco, CA 94107
   (415) 920-7100
4
   Attorneys for Plaintiff
5
   FRANK W. HUNGER
6  Assistant Attorney General
   MICHAEL J. YAMAGUCHI
7  United States Attorney
   GAIL KILLEFER
8  Assistant United States Attorney
   ANNE L. WEISMANN
9  MARK T. QUINLIVAN
       U.S. Department of Justice
10      Civil Division; Room 1048
        901 E Street, N.W.
11      Washington, D.C. 20530
        Telephone: (202) 514-3346
12
   Attorneys for Defendants
13

14              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
15

16 SETH ROSENFELD,                    )
                                      )
17            Plaintiff,              )   Case No. 90-3576 MHP
                                      )   AND
18 v.                                 )   Case No. 85-1709 MHP
                                      )   Case No. 85-2247 MHP
19                                    )
                                      )   [PROPOSED] ORDER
20 UNITED STATES DEPARTMENT OF        )
   JUSTICE, and UNITED STATES         )
21 FEDERAL BUREAU OF                  )
   INVESTIGATION,                     )
22                                    )   Date:
            Defendants.               )   Hon. Marilyn Hall Patel
23                                    )
   _____   )
24

25                         ORDER

26     This matter comes before the Court on the parties Joint

27 Motion for Entry of Settlement Agreement as an Order of Court and

28 to Retain Jurisdiction.  Upon consideration of the foregoing

1  motion, and the entire record herein, it is by the Court this 21st

2  day of May 1996

3      ORDERED that the parties' Joint Motion be, and the same

4  hereby is, GRANTED; and it is further

5      ORDERED that the parties' Settlement Agreement, which is

6  attached hereto, is hereby entered as an order of this Court; and

7  it is further

8      ORDERED that the Court will retain jurisdiction over these

9  cases in order to enforce and administer the terms of the

10 agreement and to resolve any fee disputes.

11

12

13

14                    MARILYN HALL PATEL
                  UNITED STATES DISTRICT JUDGE
15                       MAY 2 2 1996

16

17

18

19

20

21

22

23

24

25

26

27

28  [PROPOSED] ORDER
    Case Nos. 90-3576 MHP; 85-1709 MHP; 85-2247 MHP        - 2 -

# ORIGINAL



## SETTLEMENT AGREEMENT

Seth Rosenfeld (hereafter "Rosenfeld") and the Federal
Bureau of Investigation and the United States Department of
Justice (hereafter "Defendants"), through their authorized
representatives, hereby agree to the following terms:

1. The terms of this agreement apply to the records at
issue in both Rosenfeld v. FBI, District Court Nos. C-85-1709, C-
85-2247, Ninth Cir. No. 91-16538 ("Rosenfeld I"); and Rosenfeld
v. FBI, District Court No. C-90-3576 ("Rosenfeld II").  This
agreement contains the parties' legal obligation regarding the
records at issue in both Rosenfeld I and Rosenfeld II.

2. The parties agree that the records at issue in Rosenfeld
I and Rosenfeld II shall be disclosed pursuant to the terms of
this agreement, except as otherwise expressly indicated.  Under
this agreement, the disclosures and exemptions from disclosure
shall be governed by the law and representative rulings contained
in the district court's opinion (incorporating the magistrate's
ruling) and the Ninth Circuit's opinion in Rosenfeld I (see 761
F. Supp. 1440 and 57 F.3d 803), and Freedom of Information Act
("FOIA") law generally where the foregoing opinions do not cover
a specific matter, EXCEPT as modified by the following terms:

        (a)  (i)  Defendants may withhold the identities of all
confidential sources in all of the records at issue, regardless

of whether the records meet the "law enforcement purposes"
threshold of Exemption 7 (5 U.S.C. §552(b)(7)), and regardless of
whether the FBI previously sought to protect the source under
Exemption 7 or Exemption 1 (5 U.S.C. §552(b)(1)), except as
provided in Paragraph 2(a)(iii).

       (ii)  Under the agreement, "confidential sources"
are all sources who were given either express or implied
assurances of confidentiality by the FBI.  Claimed confidential
sources will be evaluated consistent with the Supreme Court's
decision in U.S. Dep't of Justice v. Landano, 113 S. Ct. 2014
(1993) and with the district court's and Ninth Circuit's
decisions, except as stated in Paragraphs (2)(a)(i) and 2(a)(iii)
of this agreement.  However, the parties agree that, for the
purposes of this agreement, all sources who were given symbol
numbers by the FBI will automatically be deemed to be confiden-
tial sources.

       (iii)  Any source who has been previously offi-
cially acknowledged by the FBI as a source, or who has publicly
testified that he or she was a source of the FBI, will be dis-
closed BUT ONLY if the record at issue relates directly to the
information in the prior disclosure and both the circumstances
and the nature of the information in the record at issue are
substantially consistent with the information provided by the

source as revealed by the prior disclosure, and only to the
extent that any such prior disclosure was not made inadvertently.

    (b)  Defendants will release the names of local, state,
and foreign police department officers in records dated 1990 or
earlier.

    (c)  Defendants will release the names and titles of
commercial and financial institution employees in documents dated
1990 or earlier.

    (d)  Defendants will release the names of all FBI
employees in documents dated 1990 or earlier.

    (e)  Defendants will release the names of all non-FBI
federal, state, and local government employees in documents dated
1990 or earlier.

    (f)  Defendants will release in its entirety all
information (that is not otherwise independently exempt from
disclosure) provided by the sources, except that the information
provided by a confidential source will not be disclosed where it
could reasonably be expected to identify the source from the
circumstances, context, or content of the statements.

(g)   No term in this agreement shall be read to require disclosure of matters properly classified pursuant to Executive Order 12958 or predecessor orders.   Classified information will be reviewed by the FBI pursuant to Executive Order 12958.   Any information withheld by the FBI as classified after such review shall be subject to challenge in the district court and further review as appropriate (see below).

3.   Defendants will also reprocess all of the <u>Rosenfeld I</u> and <u>Rosenfeld II</u> records in accordance with FOIA standards in effect as of the date of this agreement (except as modified by this agreement), including (a) the standard for Exemption 7(D) articulated by the Supreme Court in <u>Landano</u>; (b) the Freedom of Information policies announced by President Clinton and Attorney General Reno on October 4, 1993; and (c) Executive Order 12958.

4.   As part of its reprocessing of records, Defendants will update all of the University of California files responsive to Mr. Rosenfeld's request (<u>see</u> Stipulation and Order, filed October 24, 1995, in <u>Rosenfeld II</u>, at 19 (identifying records responsive to the "University of California" request)) by processing and releasing (subject to the standards set forth above) records dated up to three months prior to the date that reprocessing of the records commences.

4

5.   Defendants agree to reprocess and release the documents at issue (subject to the standards agreed to above) within a total of twelve (12) months of settlement.  The materials relating to Rosenfeld I will be processed first and processing will be completed in two months or less after the date of this agreement.  After the reprocessing of the Rosenfeld I files is complete, Defendants shall process the Rosenfeld II material. Every two months after the processing of the Rosenfeld I material is complete, the FBI shall issue interim releases of all of the material which has been processed to date.  The FBI shall attempt to issue interim disclosures of at least 15,000 pages, absent exigent circumstances.

6.   (a)  Upon signing this agreement, the parties will file a joint motion in the district court, asking the court to issue an indicative order as to whether it would enter this agreement as an order of the court and would retain jurisdiction over Rosenfeld I and Rosenfeld II in order to enforce and administer the terms of this agreement and to resolve any fee disputes.

(b)  If the district court issues an indicative order, that, upon remand, it will enter this agreement as an order of the court and will retain jurisdiction over Rosenfeld I and Rosenfeld II in order to enforce and administer the terms of this agreement and to resolve any fee disputes, then defendants will promptly dismiss the Petition for a Writ of Certiorari in this

5

case, filed in the United States Supreme Court on November 22, 1995 (No. 95-804, October Term 1995).

(c)  Upon remand to the district court, the parties will file a joint motion in the district court, asking the court to enter this agreement as an order of the court, and to retain jurisdiction over Rosenfeld I and Rosenfeld II in order to enforce and administer the terms of this agreement, and to resolve any fee disputes.

(d)  The parties stipulate to the referral of these cases to United States Magistrate Judge Phyllis Hamilton.  Upon remand, the parties will jointly ask the district court to appoint Magistrate Judge Hamilton to adjudicate all challenges to the FBI's processing of documents, claims of exemptions, and all issues relating to the disclosure of records under this agreement.

(e)  Before Magistrate Judge Hamilton, Mr. Rosenfeld will be permitted to challenge the specific disclosures (by file, document or by specific exemption within a document), to ensure that the FBI complies with this agreement.  The Magistrate Judge will permit Rosenfeld to file a reasonable number of challenges. The number of challenges will be determined by the Magistrate Judge after obtaining the views of the parties.  If the Magistrate Judge so finds, after reviewing Rosenfeld's challenges

(e.g., by examining the parties' declarations and conducting in camera review), that the FBI has not substantially complied with this agreement, the Magistrate Judge will permit additional challenges, and may order other relief as deemed necessary.

(f) The FBI will be permitted to submit additional declarations or other information to support the claimed exemptions. Rosenfeld will be permitted to submit declarations and other information to support his challenges. Specific procedures and time limits will be determined by Magistrate Judge Hamilton.

(g) The parties will ask the court to instruct Magistrate Judge Hamilton to take all reasonable steps to decide the disputed issues expeditiously.

(h) The parties agree that, except as to the materials specified in Paragraph 6(i), Magistrate Judge Hamilton's rulings regarding the processing of documents, claims of exemption, and issues relating to the disclosure of the materials at issue in Rosenfeld I and Rosenfeld II shall be final, nonappealable, and enforceable by the district court.

(i) The parties shall retain their ordinary appeal rights (to the district court and for further review) in regard to any challenge to information withheld under:

7

Exemption (b)(1), as classified pursuant to Executive
Order 12958;

Exemption (b)(3), but only insofar as the information
is claimed to relate to intelligence sources and
methods under 50 U.S.C. § 403(d)(3); and

Exemption (b)(7)(D), but only insofar as the
information is withheld under a claimed implied
assurance of confidentiality[1] (and defendants agree
that they can appeal as to no more than 40 redactions
(of the identity and identifying information provided
by a claimed source given an implied assurance of
confidentiality) pursuant to this (b)(7)(D)
subprovision).

The parties will ask the district court to issue a final
judgment containing all of its rulings on such challenges, and
that final judgment will be subject to the ordinary appeal
process.  The parties agree that if the district court orders
disclosure of such information, the court's disclosure order will
be stayed if the Government seeks further review of the court's
order.  The parties agree that, if any appeal is taken, they will
jointly move for expedition of the appeal.  Defendants further

---

[1] The appeal rights are not intended to include or relate to
symbol sources, which are addressed in Paragraph 2(a)(ii) of this
Agreement.

8

agree that the disclosure of material not subject to or implicated by the appeal will not be delayed due to any appeal taken.

(j)  When the processing is completed pursuant to this agreement, and the fee issues are resolved, and all disputes provided for in Paragraph 6(i) are finally resolved (including through appeal), the parties will ask the district court to dismiss the Rosenfeld I and Rosenfeld II actions with prejudice.

7.  (a)  Defendants stipulate that Rosenfeld has "substantially prevailed" in Rosenfeld I and Rosenfeld II, for the purposes of receiving, pursuant to 5 U.S.C. § 552(a)(4)(e), "reasonable attorney fees and other litigation costs reasonably incurred" at the district court level, upon appeal, and through settlement.

(b)  The parties agree that this Settlement Agreement does not waive or otherwise affect the possibility of the entitlement of further fees related to these cases, and that Rosenfeld has not in any way waived his right to seek attorney fees and costs for all work done in these cases, including work done in connection with the fee negotiations (and/or fee motion to the court) and all subsequent phases of the litigation before Magistrate Judge Hamilton, the district court or any other tribunal.

9

(c)  The parties will attempt to negotiate a reasonable fee amount to be paid by Defendants (which may include negotiations over the amount of fees to be paid for work in connection with the fee negotiations).  If the parties cannot agree, the fee request will be resolved by the district court upon motion.

(d)  Defendants agree that Rosenfeld may request attorney fees and costs (and/or file a motion for fees and costs in the district court) prior to the completion of the reprocessing of the records at issue.

(e)  Defendants do not concede that Rosenfeld is a prevailing party for any additional proceedings before Magistrate Judge Hamilton or the district court.  If Rosenfeld seeks attorney fees or costs for this subsequent phase of the litigation, he must file  a supplemental fee request in the district court and demonstrate that he substantially prevailed in that portion of the litigation.

8.  Rosenfeld waives his right to file any future request under the Freedom of Information Act for the records at issue in Rosenfeld I or Rosenfeld II, unless there is a significant change in FOIA law or policy, or a significant new occurrence, that would create a reasonable likelihood that additional information would be released.  If a new FOIA request is filed by Mr.

10

Rosenfeld for the records at issue in <u>Rosenfeld I</u> or <u>Rosenfeld</u> <u>II</u>, Mr. Rosenfeld agrees that Paragraph 2(a) of this agreement will be binding in regard to the new request.

9. Mr. Rosenfeld requests the following information under the FOIA from the FBI:

> Any and all records at FBIHQ, San Francisco, Los Angeles, Sacramento, San Diego, Washington Field Office, and all offices of origin, on Ronald W. Reagan (date of birth 2/06/11; UC Regent <u>ex officio</u> c. 1966-1978), from the earliest record through January 1, 1979.

The FBI agrees to process this new FOIA request as a priority matter as outlined in Subparagraphs (a) and (b). The processing of this request and any disputes arising under this new FOIA request shall be deemed a separate matter not covered by this agreement and shall not be considered part of the <u>Rosenfeld</u> <u>I</u> or <u>Rosenfeld II</u> cases.

(a) Defendants agree to process (in accordance with FOIA standards in effect as of the date of this agreement) all of the records responsive to this new request that are dated prior to July 1, 1975, and release all non-exempt records, within two months after completing reprocessing of the <u>Rosenfeld I</u> records (pursuant to Paragraph 5 of this agreement).

(b) Defendants agree to process (in accordance with FOIA standards in effect as of the date of this agreement) all of the records responsive to this new request that are dated from

11

July 1, 1975 through January 1, 1979, and release all non-exempt
records, at a rate of at least 1,000 pages per month beginning
after completion of the reprocessing of the Rosenfeld II records
(pursuant to Paragraph 5 of this agreement).

10.  The terms related to the reprocessing and release of
information under this agreement shall remain unaffected by any
subsequent decisions by the Ninth Circuit or the Supreme Court.

11.  The parties have agreed to terms and principles
articulated in this agreement for the sole purpose of settling
the Rosenfeld I and Rosenfeld II cases.  The terms of this
agreement do not establish any general policy and shall have no
precedential or binding effect beyond the scope of this specific
agreement.

THOMAS STEEL
Attorney

For Seth Rosenfeld

Dated  1-12-96.

FRANK W. HUNGER
Assistant Attorney General
Civil Division
Department of Justice

For Defendants

Dated  1/11/96.

12

# Exhibit C

4-694 (Rev. 10-18-94)



U.S. Department of Justice

Federal Bureau of Investigation

Washington, D.C. 20535

Mr. Seth Rosenfeld
301 Pennsylvania Avenue
San Francisco, CA  94107

MAY 0 2 1996

Ronald W. Reagan

Subject of Request: _____

FOIPA No. 405,193   A90-33829 _____

Dear Requester:

        Enclosed are copies of documents from FBI records. Excisions have been made to protect information exempt from disclosure pursuant to Title 5, United States Code, Section 552 (Freedom of Information Act) and/ or Section 552a (Privacy Act). In addition, where excisions were made, the appropriate exempting subsections have been cited opposite the deletions. Where pages have been withheld in their entirety, a deleted page information sheet has been substituted showing the reasons or basis for the deletion. The subsections cited for withholding information from the enclosed documents are marked below:

|  Section 552 |  |  | Section 552a |
|---|---|---|---|
| ☒ (b)(1) | ☐ (b)(7)(A) | | ☐ (d)(5) |
| ☒ (b)(2) | ☐ (b)(7)(B) | | ☐ (j)(2) |
| ☒ (b)(3) Rule 6(e), FRCP; 26 | ☒ (b)(7)(C) | | ☐ (k)(1) |
| U.S.C. 6103 per IRS; | ☒ (b)(7)(D) | | ☐ (k)(2) |
| 50 U.S.C. 403(g) | ☒ (b)(7)(E) | | ☐ (k)(3) |
| per CIA | ☐ (b)(7)(F) | | ☐ (k)(4) |
| ☐ (b)(4) | ☐ (b)(8) | | ☐ (k)(5) |
| ☐ (b)(5) | ☐ (b)(9) | | ☐ (k)(6) |
| ☒ (b)(6) | | | ☐ (k)(7) |

(See Form 4-694a, enclosed, for an explanation of these exemptions.)

Pursuant to your request, __ 2,199 __ page(s) were reviewed and __ 1,935 __ page(s) are being released.

During the review of material pertinent to the subject of your request, documents were located which

☒ originated with another Government agency(ies).
    These documents were referred to that agency(ies) for review and direct response to you.

☒ contain information furnished by another Government agency(ies). You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

[X] If you desire, you may appeal any denials contained herein. Appeals should be directed in writing to the Co-Director, Office of Information and Privacy, U.S. Department of Justice, Flag Building, Suite 570, Washington, D.C. 20530, within thirty days from receipt of this letter. The envelope and the letter should be clearly marked "Freedom of Information Appeal" or "Information Appeal." Please cite the FOIPA number assigned to your request so that it may be easily identified.

[ ] The enclosed material is from the main investigative file(s) in which the subject of your request was the subject of the investigation. There are additional references to the subject(s) of your request in files relating to other individuals, organizations, events or activities. These additional mentions or references have not been reviewed to determine if, in fact, they are identifiable with the subject(s) of your request. Our experience has shown that such references are frequently similar to information contained in the processed main file(s). We will process these references if you now make a specific request for them. However, because of a significant increase in FOIPA requests and an expanding backlog, we have given priority to the processing of main investigative files and can only complete the processing of these additional references as time and resources permit.

[X] See additional information which follows.

Sincerely yours,

*J. Kevin O'Brien*

Chief
Freedom of Information—
Privacy Acts Section
Information Resources Division

Enclosures (13)

2

Mr. Seth Rosenfeld

The enclosed documents are being released pursuant to the Settlement Agreement dated January 4, 1996, pertaining to the litigation titled, <u>Seth Rosenfeld v. United States Department of Justice and Federal Bureau of Investigation.</u>  In accordance with this agreement, this release concerns all records pertaining to Ronald W. Reagan from the earliest record to July 1, 1975, at FBI Headquarters (FBIHQ) and the Los Angeles, Sacramento, San Diego, San Francisco and Washington field offices.  This release consists of documents previously processed for other requesters which have been reprocessed under current FOIA guidelines and additional documents not previously processed.

Please be advised that this release contains processed documents from both main files and cross-references.  A cross-reference is a mention of your subject by name in a file on another individual, organization, event, activity, or the like.

In processing cross-references, the pages considered for possible release included only those pages which mention your subject by name and any additional pages showing the context in which your subject was mentioned.  When such a page also contained information about other subject matters, the information "outside the scope" of the request was marked "o/s" and bracketed.  Whenever possible, the o/s material was released; however, it was withheld if consultation with another government agency would be required or if it would have been otherwise exempt from disclosure.  For your information, the exemptions that would have applied to that material had it been within the scope of your request have also been noted on the document.

For your information, the file numbers for several of the processed cross-references have been deleted.  The file numbers which were deleted for classification reasons have been numbered one through nine for your convenience.  Additionally, one cross-reference file number which was deleted under other exemptions was labeled document number one.

Also, there are eight cross-references which are on special locate at FBIHQ.  When located, these cross-references will be processed and released to you if found to be identifiable with your subject.

Numerous documents included in the material pertinent to your request were found to be duplicative of other documents being released.  These duplicate documents have not been considered for release unless additional information was included on the duplicate document.

3

Mr. Seth Rosenfeld

Please be advised that one FBIHQ main file, 95-124920, which may pertain to the subject of your request, has been sent to the National Archives. Since that material was not reviewed, it is not known if it actually pertains to your subject. You may wish to correspond directly with the National Archives, 8601 Adelphi Road, College Park, Maryland 20740-6001.

In addition, some of the field office main files pertaining to your subject have been destroyed. The records destruction practices of the FBI are conducted in full compliance with Title 44, United States Code, Chapter 33 and the Code of Federal Regulations, Title 36, Chapter 12, Subpart 1228. The FBI Records Retention Plan and Disposition Schedules have been approved by the National Archives.

Finally, as agreed upon, all records pertaining to your subject from July 1, 1975, through January 1, 1979, will be processed and released at a rate of at least 1,000 pages per month beginning after completion of the Rosenfeld II records.

4

JV.10-18-94)

# EXPLANATION OF EXEMPTIONS

## SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b) (1) (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy  and (B) are in fact properly classified pursuant to such Executive order;

(b) (2) related solely to the internal personnel rules and practices of an agency;

(b) (3) specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b) (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b) (5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b) (6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b) (7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;

(b) (8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b) (9) geological and geophysical information and data, including maps, concerning wells.

## SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d) (5) information compiled in reasonable anticipation of a civil action proceeding;

(j) (2) material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k) (1) information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k) (2) investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k) (3) material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k) (4) required by statute to be maintained and used solely as statistical records;

(k) (5) investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k) (6) testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k) (7) material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

# Exhibit D

4-664 (Rev. 10-18-94)



U.S. Department of Justice

Federal Bureau of Investigation

Washington, D.C. 20535

Mr. Seth Rosenfeld
301 Pennsylvania Avenue
San Francisco, CA  94107

FEB 27 1997

Subject of Request: <u>Ronald W. Reagan</u>

FOIPA No. <u>405,193</u>    /190-33829

Dear Requester:

Enclosed are copies of documents from FBI records. Excisions have been made to protect information exempt from disclosure pursuant to Title 5, United States Code, Section 552 (Freedom of Information Act) and/ or Section 552a (Privacy Act). In addition, where excisions were made, the appropriate exempting subsections have been cited opposite the deletions. Where pages have been withheld in their entirety, a deleted page information sheet has been substituted showing the reasons or basis for the deletion. The subsections cited for withholding information from the enclosed documents are marked below:

|  | Section 552 | | | Section 552a |
|---|---|---|---|---|
| ☐ (b)(1) | | ☐ (b)(7)(A) | | ☐ (d)(5) |
| ☒ (b)(2) | | ☐ (b)(7)(B) | | ☐ (j)(2) |
| ☐ (b)(3)_____ | | ☒ (b)(7)(C) | | ☐ (k)(1) |
| _____ | | ☒ (b)(7)(D) | | ☐ (k)(2) |
| _____ | | ☐ (b)(7)(E) | | ☐ (k)(3) |
| _____ | | ☐ (b)(7)(F) | | ☐ (k)(4) |
| ☐ (b)(4) | | ☐ (b)(8) | | ☐ (k)(5) |
| ☐ (b)(5) | | ☐ (b)(9) | | ☐ (k)(6) |
| ☒ (b)(6) | | | | ☐ (k)(7) |

(See Form 4-694a enclosed, for an explanation of these exemptions.)

Pursuant to your request, ____902____ pages(s) were reviewed and ____851____ pages(s) are being released.

During the review of material pertinent to the subject of your request, documents were located which

☒ originated with another Government agency(ies).
These documents were referred to that agency(ies) for review and direct response to you.

☒ contain information furnished by another Government agency(ies). You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

[X] If you desire, you may appeal any denials contained herein. Appeals should be directed in writing to the Co-Director, Office of Information and Privacy, U.S. Department of Justice, Flag Building, Suite 570, Washington, D.C. 20530, within thirty days from receipt of this letter. The envelope and the letter should be clearly marked "Freedom of Information Appeal" or "Information Appeal." Please cite the FOIPA number assigned to your request so that it may be easily identified.

[ ] The enclosed material is from the main investigative file(s) in which the subject of your request was the subject of the investigation. There are additional references to the subject(s) of your request in files relating to other individuals, organizations, events or activities. These additional mentions or references have not been reviewed to determine if, in fact, they are identifiable with the subject(s) of your request. Our experience has shown that such references are frequently similar to information contained in the processed main file(s). We will process these references if you now make a specific request for them. However, because of a significant increase in FOIPA requests and an expanding backlog, we have given priority to the processing of main investigative files and can only complete the processing of these additional references as time and resources permit

[X] See additional information which follows.

Sincerely yours,

Chief
Freedom of Information-
Privacy Acts Section
Information Resources Division

Enclosures (11.)

2

Mr. Seth Rosenfeld

    The enclosed documents represent the final scheduled release pursuant to the Settlement Agreement dated January 4, 1996, pertaining to the litigation titled, Seth Rosenfeld v. United States Department of Justice and Federal Bureau of Investigation. In accordance with this agreement, this release consists of all records pertaining to Ronald W. Reagan from July 1, 1975 through January 1, 1979, at FBI Headquarters (FBIHQ) and the Los Angeles, Sacramento, San Diego, San Francisco, and Washington field offices.

    Please be advised that this release contains processed documents from both main files and cross-references. A cross-reference is a mention of your subject by name in a file on another individual, organization, event, activity, or the like.

    In processing cross-references, the pages considered for possible release included only those pages which mention your subject by name and any additional pages showing the context in which your subject was mentioned. When such a page also contained information about other subject matters, the information "outside the scope" of the request was marked "o/s" and bracketed. Whenever possible, the o/s material was released; however, it was withheld if consultation with another government agency would be required or if it would have been otherwise exempt from disclosure. For your information, the exemptions that would have applied to that material had it been within the scope of your request have also been noted on the document.

    Also, eight cross-references from your former time frame remain on special locate at FBIHQ. One cross-reference has been placed on special locate at FBIHQ from your later time frame. When located, these cross-references will be processed and released to you if found to be identifiable with your subject.

    In addition, numerous documents processed pursuant to your request were found to be duplicative of those documents which have been previously processed. These duplicate documents have not been considered for release unless additional information was included on the duplicate document.

    Finally, one of the field office main files pertaining to your subject has been destroyed. The records destruction practices of the FBI are conducted in full compliance with Title 44, United States Code, Chapter 33 and the Code of Federal Regulations, Title 36, Chapter 12, Subpart 1228. The FBI Records Retention Plan and Disposition Schedules have been approved by the National Archives.

. (cv.10-18-94)

## EXPLANATION OF EXEMPTIONS

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b) (1)  (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy  and (B) are in fact properly classified pursuant to such Executive order;

(b) (2)  related solely to the internal personnel rules and practices of an agency;

(b) (3)  specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the  matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b) (4)  trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b) (5)  inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b) (6)  personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b) (7)  records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to  a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;

(b) (8)  contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b) (9)  geological and geophysical information and data, including maps, concerning wells.

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d) (5)  information compiled in reasonable anticipation of a civil action proceeding;

(j) (2)  material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k) (1)  information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k) (2)  investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k) (3)  material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k) (4)  required by statute to be maintained and used solely as statistical records;

(k) (5)  investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k) (6)  testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k) (7)  material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

# Exhibit E

LAW OFFICE OF THOMAS STEEL
301 PENNSYLVANIA AVENUE
SAN FRANCISCO, CA 94107

THOMAS STEEL
DREW TROTT
D. GILL SPERLEIN

TELEPHONE: (415) 920-7100
FACSIMILE: (415) 920-7101

July 28, 1997

Mark T. Quinlivan
U.S. Department of Justice
Civil Division, Room 1045
901 E Street, N.W.
Washington, D.C 20530

RE:  *Rosenfeld v. Department of Justice*
    *Appeal of FOIAPA No. 405, 193 Ronald Wilson Reagan*

via facsimile

Dear Mr. Quinlivan:

This is an appeal, pursuant to the FOIA, of the FBI's withholdings in the above reference FOIAPA request.

We believe that the FBI has withheld information that should have been released.

As you know, the FOIA provides that agencies must respond specifically to requests for information, and release all categories of non-exempt information. Agencies also must release all reasonably segregable portions of records. Moreover, under the applicable policies of President Clinton, Attorney General Reno, and Executive Orders on Classification, agencies must make the fullest possible disclosure of records and may make additional discretionary releases.

We trust that on review of this matter you will agree that additional information should be released. Further, we expect that you will provide a detailed index as required by Vaughn v. Rosen for any information you maintain is exempt.

We look forward to your timely response. Thank you again for your help.

Very truly yours,

Thomas Steel

TS/mg

# Exhibit F

LAW OFFICE OF THOMAS STEEL
301 PENNSYLVANIA AVENUE
SAN FRANCISCO, CA 94107

THOMAS STEEL
DREW TROTT
D. GILL SPERLEIN

TELEPHONE: (415) 920-7100
FACSIMILE: (415) 920-7101

September 25, 1997

Mark T. Quinlivan
Federal Programs Branch
Civil Division
U.S. Department of Justice
901 E Street, N.W., Room 1045
Washington, D.C. 20530
(202) 616-8470 facsimile

RE:    Appeal of FOIPA No. 405, 193 Ronald Wilson Reagan

via facsimile and U.S. mail

Dear Mr. Quinlivan:

This letter concerns the above referenced FOIAPA matter and my letter to you of July 28, 1997, appealing the FBI's withholdings in it.

To date, I have had no response to this appeal from either you or the FBI.

As you know, my client has entered into the settlement that provided for the release of these records in a spirit of cooperation and in an effort to resolve matters expeditiously. As you also know, the FOIA provides that agencies shall respond to appeals within a timely period, which has elapsed in this matter.

Therefore, I would very much appreciate your responding to this appeal as soon as possible.

Thank you again for your help.

Very truly yours,

D. Gill Sperlein
Associate Attorney

# Exhibit G

U.S. Department of Justice

Office of Information and Privacy

*Telephone: (202) 514-3642*                    *Washington, D.C. 20530*

Thomas Steel, Esq.
301 Pennsylvania Avenue            Re:   Appeal No. 97-3116
San Francisco, CA  94107                 RLH:MAP:PNC

Dear Mr. Steel:

You appealed on behalf of your client, Seth Rosenfeld, from
the action of the Federal Bureau of Investigation on his request
for access to records pertaining to Ronald Reagan that are dated
prior to January 1, 1979.

As a result of discussions between FBI personnel and members
of my staff, a supplemental release of one page is enclosed.  In
light of this fact and after careful consideration of your
appeal, I have otherwise decided to affirm the action in this
case.  Mr. Reagan is the subject of seventy-nine main files,
consisting of thirty-three Headquarters main files, twelve Los
Angeles Field Office main files, sixteen Sacramento Field Office
main files, three San Diego Field Office main files, eleven San
Francisco Field Office main files and four Washington
Metropolitan Field Office main files.  In addition, Mr. Reagan is
alluded to briefly one hundred eighty-four times in other files,
the subjects of which are other individuals or organizations.
The FBI has processed only those portions of the latter files
which pertain to Mr. Reagan.  Certain of the material within the
scope of your client's request is classified and I am affirming
the denial of access to it on the basis of 5 U.S.C. § 552(b)(1).
This material is being referred to the Department Review Commit-
tee for its review and a determination whether it warrants
continued classification under Executive Order No. 12958.  You
will be notified if the Committee's final decision results in the
declassification of any information.  Other material was properly
withheld from your client pursuant to 5 U.S.C. § 552(b)(2), (3),
(6), (7)(C) and (7)(D).  These provisions pertain to purely
internal agency practices (in this instance, source symbol
numbers and file numbers), and to material exempted from release
by statute (in this instance, Rule 6(e) of the Federal Rules of
Criminal Procedure, which pertains to the secrecy of grand jury
proceedings; 26 U.S.C. § 6103, which pertains to third-party
income tax information; and 50 U.S.C. § 403(g), which pertains to
the functions of the Central Intelligence Agency), and to mate-
rial the release of which would constitute a clearly unwarranted
invasion of the personal privacy of third parties, and to records

- 2 -

or information compiled for law enforcement purposes, the release of which could reasonably be expected to constitute an unwarranted invasion of the personal privacy of third parties, and to disclose the identities of confidential sources and information furnished by such sources. Names of FBI agents and employees were among the items excised on the basis of 5 U.S.C. § 552(b)(7)(C). This material is not appropriate for discretionary release.

Your request for itemization of the material withheld, with a justification in each instance, is denied. In my opinion, such a listing is not required and would be unreasonably burdensome for this Department to compile at the administrative stage of processing Freedom of Information Act requests and appeals.

Judicial review of my action on this appeal is available to your client in the United States District Court for the judicial district in which he resides or has his principal place of business, or in the District of Columbia, or in the Northern District of California, the Eastern District of California, the Central District of California, or the Southern District of California, all of which are where portions of the records sought are located.

Sincerely,

Richard L. Huff
Co-Director

Enclosure

# Exhibit H



U.S. Department of Justice

Federal Bureau of Investigation

Washington, D. C. 20535

APR 1 7 1998

Mr. Seth Rosenfeld
301 Pennsylvania Avenue
San Francisco, CA 94107

Dear Mr. Rosenfeld,

Reference is made to the phone conference with members of my staff on February 6, 1998, and your March 2, 1998, letter to Mark Quinlivan, Civil Division, Department of Justice concerning your Freedom of Information Act request on Ronald Reagan.

Enclosed are the most complete copies available of five documents you mentioned in the above letter that you determined had portions which were illegible.

Also enclosed is a list of main files and cross-references which, upon a search of FBI Headquarters and pertinent field offices indices, were found to be destroyed.

In addition, enclosed is a list which details the status of referrals to other federal government agencies.

In regard to your request for copies of the search slips and inventories pertaining to your request, these are still being reviewed by our Document Classification Unit (DCU) and upon completion of their review, will be forwarded expeditiously. Finally, in reference to your request for the status of nine cross-references which we previously advised you were on locate, most of these have been located and sent to DCU. Upon the completion of the DCU review, they will be processed and forwarded expeditiously.

Sincerely yours,

J. Kevin O'Brien, Chief
Freedom of Information-
    Privacy Acts Section
Office of Public and
    Congressional Affairs

Enclosures (3)

# Exhibit I

LAW OFFICE OF THOMAS STEEL
301 PENNSYLVANIA AVENUE
SAN FRANCISCO, CA 94107

THOMAS STEEL
DREW TROTT
D. GILL SPERLEIN

TELEPHONE: (415) 920-7100
FACSIMILE: (415) 920-7101

March 2, 1998

## VIA FACSIMILE AND U.S. MAIL

Mr. Mark T. Quinlivan
Trial Attorney
Federal Programs Branch
Civil Division
U.S. Department of Justice
901 E St., N. W.
Washington, DC 20530

RE: Rosenfeld v. Department of Justice

Dear Mark,

Our review of the materials released on Ronald Reagan shows that it did not include search slips used to process this request.

Would you kindly send all search slips used to process this request, at headquarters and field offices, to us as soon as possible. Please send us one copy by fax and the other by regular mail.

Please call me at the above number if I may be of assistance.

Thank you again for your help.

Sincerely,

Thomas Steel

# Exhibit J

**U.S. Department of Justice**

Civil Division

---

Mark T. Quinlivan
(202) 514-3346

Washington, D.C. 20530

February 26, 1999

<u>VIA OVERNIGHT DELIVERY</u>

Elizabeth Pritzker
First Amendment Project
1736 Franklin Street, 9th Floor
Oakland, CA 94612

     Re:    Rosenfeld v. United States Department of Justice

Dear Elizabeth:

     Enclosed please find the following materials:

     1.  Search slips:  Mr. Watson has completed the processing of approximately 25% of the search slips which were requested by Mr. Rosenfeld, and they are enclosed. Each group has been numerically numbered in the lower right hand corner for easy reference.

     The remaining search slips will be sent to Mr. Rosenfeld by Friday, March 5, 1999. Mr. Watson has informed me that this is an extremely time-consuming process, insofar as each number has to be individually entered into the computer database to see if the file number has been withheld. As we informed Mr. Rosenfeld previously, the RBase system, upon which much of this information was stored, "crashed" some two years ago, and some data was lost. Consequently, when a particular number does not appear in the database, Mr. Watson attempts to check every possible combination of numbers in the attempt to locate it.

     As always, your extraordinary patience is very much appreciated.

     2.  Index cards:  The processing of the Ronald Reagan index cards has been completed, and the cards are enclosed. Mr. Watson is currently processing the remaining index cards requested but, because he is following the same procedure utilized with the search slips, it has been an extremely time-consuming process. Mr. Watson has informed me, however, that the remaining index cards will be sent to Mr. Rosenfeld by Friday, March 5, 1999.

- 2 -

3. HQ 197-425. Attached are 196 pages of this file, which are numerically numbered 1-196 beginning with the file cover. Certain information which had been classified pursuant to 5 U.S.C. § 552(b)(1), see pages 7, 73, 77, 82, and 84-86), has been sent to the Document Classification Unit for re-review. When this is re-review is completed, we will provide Mr. Rosenfeld with an update on those pages. You should also be aware that, while the FBI reserves the right to cite other exemptions for all information that has been declassified, it is anticipated that the majority of this information will, in all likelihood, be released.

You should also be aware that pages 99 and 100 are permanent "chargeouts" in this file. We will advise Mr. Rosenfeld of the status of these pages if they are responsive.

On a related matter, Mr. Watson is continuing to attempt to locate the search slips for the Rosenfeld I search, although he is having difficulty finding them. The employee who was responsible for these slips in the 1980's no longer is employed by the FBI. Mr. Watson will continue to attempt to locate these slips and, if they are found, they will be processed and released to Mr. Rosenfeld.

Finally, I have been in the midst of a summary judgment briefing in another case, and have been unable to respond to your inquiries from our February 3 telephone conference. I will do so by Friday, March 5, 1999.

Thank you again for your and Mr. Rosenfeld's patience. In the meantime, if you have any questions, please do not hesitate to contact me at (202) 514-3346.

It was a pleasure speaking with you and Mr. Rosenfeld by telephone on February 3.

Sincerely yours,

MARK T. QUINLIVAN
Trial Attorney
Federal Programs Branch
Civil Division

Enclosures

U.S. Department of Justice

Civil Division

Mark T. Quinlivan
(202) 514-3346

*Washington, D.C. 20530*

March 12, 1999

## VIA FACSIMILE AND OVERNIGHT DELIVERY

Elizabeth Pritzker
First Amendment Project
1736 Franklin Street, 9th Floor
Oakland, CA 94612

Re:   Rosenfeld v. United States Department of Justice

Dear Elizabeth:

I am writing as a follow-up to my letter of February 26, 1999. I apologize for the delay in this correspondence. I was unable to reach you by telephone earlier this week, and just returned to the office this morning from Knoxville, Tennessee, on a different matter.

In my letter of February 26, I stated that the FBI would provide Mr. Rosenfeld with the remaining materials which he had requested by March 5, 1999. Unfortunately, unforeseen developments have once again delayed the FBI's response to Mr. Rosenfeld's outstanding requests. In particular, the FBI has determined, after conducting a thorough and time-consuming review of the index cards which Mr. Rosenfeld has requested, that certain files reflected in those cards do appear in the FBI database of records processed in response to Mr. Rosenfeld's Freedom of Information Act requests. While this may be due to the fact that much of the information in this database was corrupted due to a database "crash," it is also possible that these records were not processed.

Accordingly, we have itemized those records which do not appear in the FBI database on the cover sheet of each set of index cards. If Mr. Rosenfeld has received the files which are listed on this cover page, please advise us. If, on the other hand, Mr. Rosenfeld has not received these records, the FBI will immediately commence processing these records in accordance with the parties' Settlement Agreement.

For your information, the enclosed index cards are as follows:

- 2 -

| | |
|---|---|
| **University of California:** | FBI Headquarters |
| | San Francisco |
| | Los Angeles |
| | San Diego |
| | Sacramento |
| | |
| **Clark Kerr:** | FBI Headquarters |
| | San Francisco |
| | San Diego |
| | Washington Metropolitan Field Office |
| | |
| **Mario Savio:** | New York |
| | Minneapolis |

I have also enclosed a copy of the FBI Headquarter index cards for the Ronald Reagan search. While my letter of February 26 reflects that these records were provided to you on that date, I may have inadvertently omitted them from my package of materials. If so, I apologize for the error.

I will be speaking to Mr. Watson on Monday regarding the status of all other outstanding matters (Mr. Watson was on leave today, March 12), and will provide you with an update by Monday or Tuesday of next week.

Once again, we appreciate your patience in regards to these matters.

Sincerely yours,

MARK T. QUINLIVAN
Trial Attorney
Federal Programs Branch
Civil Division

Enclosures