JOSEPH P. RUSSONIELLO (CSBN 44332)
United States Attorney
JOANN M. SWANSON (CSBN 88143)
Chief, Civil Division
ELLEN M. FITZGERALD (NY 2408805)
Assistant United States Attorney
450 Golden Gate Avenue, 9th Floor
San Francisco, California 94102-3495
Telephone: (415) 436-7314
Facsimile: (415) 436-6748
Email: ellen.fitzgerald@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

SETH ROSENFELD,

Plaintiff,

v.

UNITED STATES DEPARTMENT OF JUSTICE, and UNITED STATES FEDERAL BUREAU OF INVESTIGATION,

Defendants.

No. C 90-3576 MHP; No. C 85-1709 MHP
No. C 85-2247 MHP; No. C 07-3240 MHP

**SECOND DECLARATION OF DAVID M. HARDY**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SETH ROSENFELD,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION and U.S. DEPARTMENT OF JUSTICE,<br><br>Defendants. | Civil Action No. 07-CV-03240 |

**SECOND DECLARATION OF DAVID M. HARDY**

I, David M. Hardy, declare as follows:

(1) I am currently the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), at the Federal Bureau of Investigation Headquarters ("FBIHQ") in Washington, D.C. I have held this position since August 1, 2002. Prior to joining the FBI, from May 1, 2001 to July 21, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the state of Texas since 1980.

(2) In my official capacity as Section Chief of RIDS, I supervise approximately 190

employees who staff a total of ten (10) units and a field operational service center unit whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to FOIA; Privacy Act; Executive Order 12958, as amended; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3) Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am aware of the treatment which has been afforded plaintiff's FOIA requests seeking access to records pertaining to nine subjects: (1) Ronald Reagan, (2) Herbert Ellingwood, (3) Alexander C. Sherriffs, (4) Roy M. Brewer, (5) Neil Reagan, (6) "80" Files, (7) The Motion Picture Industry Council, (8) The Labor League of Hollywood Voters, and (9) The Motion Picture Alliance for the Preservation of American Ideals.

(4) The purpose of this declaration is to provide the Court and plaintiff with additional information regarding the search for records responsive to plaintiff's FOIA requests. Specifically, this declaration addresses the following issues raised by plaintiff in his June 2, 2008 Notice of Motion and Motion for Summary Judgment ("Motion"): (a) inadequate or nonexistent search slips; (b) failure to produce abstracts; (c) cross-references not searched and not processed in the manner specified by plaintiff; (d) reprocessing of Ronald Reagan records; (e) failure to

search particular indices; (f) records identified but not released; (g) office of origin files; (h) records listed in search slips not produced; and (i) serials responsive to the Brewer request.

**OVERVIEW OF FBI'S SEARCH FOR RECORDS**

(5) As stated in the June 2, 2008 Declaration of David M. Hardy ("Hardy Declaration"), the FBI employed two mechanisms as part of its search efforts to identify records responsive to plaintiff's requests. These methods are the same methods that the FBI uses to search for records potentially responsive to any other FOIA request it receives. In order to locate records responsive to plaintiff's requests, thc FBI searched for records by 1) conducting a search for records in the FBI's Central Records System ("CRS"), and 2) performing manual searches for potentially responsive records. Through these two search methods the FBI located an aggregate total of 22,373 pages of records responsive to plaintiff's requests.

**SEARCH SLIPS**

(6) The search slips provided by the FBI to plaintiff document the search for records that took place at FBIHQ. Search slips are created by FBIHQ personnel in order to keep track of the places searched, the terms used to conduct the search, and the dates on which the search was conducted. Plaintiff objects that none of the search slips provided by the FBI were created at FBI field offices. RIDS has contacted the field offices that received requests from plaintiff in order to determine whether they keep search slips or any other record of their manual search for records responsive to FOIA requests. The field offices are no longer required to create search slips for FOIA purposes, however, they did keep a record of the date that they performed manual searches

for records responsive to plaintiff's requests for the following subjects.[1] These dates are as follows:

| | Subject | Office | Date |
|---|---|---|---|
| (a) | Ronald Reagan | San Diego (SD) | 01/22/2008 |
| | | Sacramento (SC) | 01/22/2008 |
| | | PITC | 02/06/2008 |
| | | Washington Field Office (WFO) | 02/22/2008 |
| | | Los Angeles (LA) | 01/22/2008 |
| | | San Francisco (SF) | 02/06/2008 |
| (b) | Herbert Ellingwood | SD | 07/21/2006 |
| | | SF | 07/21/2006 |
| | | WFO | 07/21/2006 |
| | | LA | 07/18/2006 |
| (c) | Alex Sherriffs | SF | 07/29/2004 |
| (d) | Roy Brewer | LA | 12/01/2006 |
| | | WFO | 11/29/2006 |
| (e) | Neil Reagan | LA | 05/23/2005 |
| | | | 03/10/2008 |
| | | WFO | 05/23/2005 |
| | | | 03/10/2008 |
| (f) | Motion Picture Industry Council | LA | 08/18/2006 |
| (g) | Labor League of Hollywood Voters | LA | 08/18/2006 |
| (h) | Motion Picture Alliance for the Preservation of American Ideals | LA | 08/18/2006 |

**ABSTRACTS**

(7) Plaintiff objects because he has not received any abstracts in response to his requests. By way of background, it will be helpful to explain the nature of the FBI's abstract-card system. As a threshold matter, FBI files were, and continue to be, maintained using a numerical filing system. When the FBI opens a new case, it is assigned a Universal Case File

[1]Each of the field offices listed were contacted and the FBI will make the search slips available to plaintiff by June 30, 2008, for those offices that did compile a search slip.

Number ("UCFN"), which is utilized by FBIHQ and all field offices that are conducting or assisting in the investigation. Using a hypothetical file number "12-WF-1234" as an example, "12" indicates the file classification for the specific type of investigation (which corresponds to a federal crime for which the FBI has jurisdiction, or an administrative or personnel matter); "WF" is the abbreviated form used for the Office of Origin of the investigation, which in this example is the FBI's Washington Metropolitan Field Office; and "1234" indicates the individual case file number for the particular classification of investigation (a separate and distinct number assigned to each matter). Finally, within each investigative file, a separate and distinct serial number is assigned sequentially to each document, in the order in which the document is added to that file, typically in chronological order, with the most recent document having the highest number. Thus, again using fictitious file number "12-WF-1234," serial 1 would be represented as "12-WF-1234-1," serial 2 would be represented as "12-WF-1234-2," and so on, until we reach the last serial in that file.

(8) The abstract card system was in effect at the FBI from 1921 to 1979. The primary purpose of the abstract card system, as I will explain in further detail below, was to assist in the determination of the next sequential serial number to assign to a document in a particular file, as well as to quickly distinguish documents within a given file. Although the need for the abstract card system was obviated in 1976 when the FBI adopted the Automated Incoming Mailing Serialization, the FBI continued to type abstract cards through 1979.

(9) The abstract card itself consists of a 3 x 5 two-ply carbon form typed by an FBI clerical employee who was not involved with the investigative activities of a case. In order to

prepare the abstract summary, the FBI clerical employee first conducted a cursory review of each document received or generated. The employee then typed an abstract card summary based on this cursory review, which consisted of a two to three-sentence summary of the document's contents; the date of the document; the file classification, case number, and serial number of the document; the author of the document; and the employee's identification code.

(10) The abstract cards were stored and maintained in sequential order by case number and serial.[2] In order to determine the next serial number to be assigned to an incoming document within a given case – without having to retrieve the physical file from its storage location each time – FBI clerical employees searched the abstract cards. Once the case number was located, the employee verified that an abstract card had not already been prepared for that specific document, and determined the next sequential serial number to be assigned. For example, if the last abstract card for the fictitious file number "12-WF-1234" was 18, the next serial number assigned to the newest incoming document would have been 19. The employee then typed this new serial number "19" on the abstract card and wrote the serial number "19" on the incoming document. The abstract card was then separated. The original was placed at the back of the drawer for the corresponding case and the carbon copy was sent to another unit for storage. The newly serialized document was sent to the file storage location.

(11) The entry-level clerks who typed abstract cards were neither trained – nor expected – to interpret the documents in front of them. These employees were simply typing

---

[2] A duplicate set of abstract cards was stored and maintained in alphabetical order by author's name for documents received by the FBI, and by the originating office for documents authored by the FBI.

sufficient information onto the abstract card to memorialize the receipt of a new document in order to assign it a new serial for placement in the file. These employees did not determine the importance of the contents of the document.

(12) The abstract cards have been in storage for over twenty years. They are not now – nor were ever intended – to be used as a means to search for and retrieve documents from a case file. Rather, as I explained in detail above, the cards were used simply as a means to determine the next serial to assign to a document prior to its placement in the case file.

(13) The "numbering set" was placed into storage in 1983 at a Federal Records Center in Suitland, Maryland, operated by the National Archives and Records Administration ("NARA"). The FBI pays an annual fee to NARA for the storage of these and other FBI records. Each time NARA removes records material from its storage location for review, copying, destruction, or transfer, a fee is charged. The "numbering set" of abstracts is stored in boxes. According to the NARA website, the Federal Records Center is a 789,000 square foot facility, which has a capacity to store 3.9 million cubic feet of records. Within the boxes, the abstracts are loosely stacked three levels high, two rows side-by-side per level, with a single sheet of brown wrapping paper or cardboard between each row. There are approximately 2,000 boxes of abstract cards stored in the Federal Records Center facility. There is no master index for the abstract cards contained within each box. Although most of the boxes indicate the case file and serial scope of the cards, many boxes are devoid of markings. The boxes are stored according to a NARA master file locator system that does not correspond in any way to the information contained within the boxes.

(14) Although both the documents in a case file and the abstracts are each filed sequentially according to the file and serial number, the similarities end there. The case files and the abstract cards are two separate and distinct series of records. Each has a separate disposition according to the FBI's approved records retention schedule. The case files are searchable through, and retrieved by, an automated search of the Central Records System via the Automated Case Support System ("ACS"). By contrast, the abstract card system must be hand-searched. It is not automated and cannot be searched electronically. Therefore, abstracts cannot be searched by subject matter.

(15) The FBI estimates that a hand-search of approximately 2000 boxes of abstract cards, containing 15,000 cards each, would take one FBI employee 38 years to complete.[3] The individual searching these boxes would have to review each card for each of the nine subjects requested by plaintiff, which would take approximately one week to review one box of abstract cards.

**CROSS-REFERENCES**

(16) A cross-reference is defined generally as only a mere mention or reference to an individual, organization, event, activity, or other subject matter contained in a document located in a different main file on a different subject matter. The FBI searched for cross-references for all subjects requested by plaintiff. The FBI considers cross-reference pages to be responsive when the pages 1) mention the subject of a request and 2) contain context for the pages in which

---

[3] In addition, it would cost the FBI approximately $60,000 to have the boxes removed from the records storage facility for processing and returned.

the subject of the request was mentioned. These responsive pages giving context include the first page of the document, which contain the date and subject matter, as well as any other pages that explain the context of the page where the subject is mentioned. The remaining pages within a cross-reference document are "outside the scope" of the request. As with all other aspects of its search, the FBI has treated the plaintiff like every other FOIA requester.

**RONALD REAGAN RECORDS**

(17) The FBI interpreted plaintiff's August 6, 2007 request to only be for any additional records on Ronald Reagan not previously produced. The FBI, however, is willing to make every effort to reprocess the records released in letters to plaintiff dated May 2, 1996, and February 27, 1997, searching for subsequent deaths of persons listed within them, subsequent declassification, or any other basis for additional disclosure. The FBI has begun the process of gathering the files necessary, so that the reprocessing can begin. The referrals emanating from these responsive records will be handled anew by the FBI.

(18) The plaintiff states in his Motion that the FBI should search for Ronald Reagan records "in the files on COMPIC; the Screen Actors Guild; the Labor League of Hollywood Voters; the Motion Picture Industry Council; Herb Sorrell; the Hollywood Independent Citizens Committee of the Arts, Sciences and Professions; the Music Corporation of America; and in the records of the late actors Larry Parks, Howard Da Silva and Alexander Knox . . . ." Plaintiff further requested that the FBI search for records on Ronald Reagan by using search terms, including but not limited to those derived from his 1965 memoir, "Where's the Rest of Me? The Ronald Reagan Story," and his "meeting with the FBI around 1948." Records on Ronald Reagan

would be indexed by his name either in main files on him, or in cross-references mentioning him. A search of the CRS located all records that were indexed to his name, and these records were processed.

(19) To find any mention of "Ronald Reagan" in all the files listed by plaintiff would require a page-by-page review of each file. The FBI does not conduct such reviews of serials and/or files in which a subject is not indexed as either a main entry or a cross-reference.

## SEARCH OF PARTICULAR INDICES

(20) The plaintiff mentions throughout his motion that the FBI did not search particular indices for records responsive to his requests. Record systems like the Electronic Surveillance Indices ("ELSUR") that have their own system of records notice are searched separately. Thus, ELSUR was searched in this case. All other material is retrievable through a search of the CRS, which the FBI has already conducted.

## RECORDS IDENTIFIED BUT NOT RELEASED

(21) Plaintiff states that certain records were identified, however, the FBI has indicated to plaintiff that these records were 1) not located, 2) were destroyed, or 3) were accessioned to the National Archives. For the first set of records, the FBI has thoroughly searched for these records, but has been unable to locate them. FBI has also memorialized that the other records mentioned by plaintiff were either destroyed or accessioned.

## OFFICE OF ORIGIN FILES

(22) In accordance with the Department of Justice FOIA regulations, 28 C.F.R. § 16.3(a), FOIA requesters are placed on constructive notice that it is incumbent upon them to

direct their requests to those FBI field offices most likely to have responsive records. The FBI searched for records at all field offices to which plaintiff sent a request for records. Pursuant to the regulations cited above, the plaintiff must make a request to a field office that he believes would be the "office of origin" for these records.

**RECORDS LISTED IN SEARCH SLIPS THAT WERE NOT PRODUCED**

(23) Plaintiff states that certain files that are listed in the search slips were not produced. The search slips contain all files that are potentially responsive to a FOIA request. After these files were located and reviewed by RIDS personnel, many times they were determined not to be responsive to the FOIA request,[4] and therefore are not processed and released to a requester.

**BREWER REQUEST SERIALS**

(24) Plaintiff states that the FBI stopped reviewing file 100-138754 after looking at only the first 39 serials in that file. The FBI processed all serials wherein Brewer's name was indexed in file 100-138754. His name appeared in the first 39 serials in the file. We did not conduct a page-by-page review of the entire file, because we do not conduct a page-by-page review of an entire file in which the subject is indexed as a cross-reference for particular serials.

[4] For example, the records are often found to not be identical to the subject of the request.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of June, 2008.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.