United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SETH ROSENFELD,

         Plaintiff,

  v.

UNITED STATES DEPARTMENT OF
JUSTICE, and UNITED STATES FEDERAL
BUREAU OF INVESTIGATION,

         Defendants.

_____/

No. C 07-3240 MHP

**MEMORANDUM & ORDER**

**Re:  Second set of Cross-Motions for
Summary Judgment**

      On June 19, 2007 plaintiff Seth Rosenfeld filed a complaint pursuant to the Freedom of
Information Act ("FOIA"), 5 U.S.C. section 552, against the Department of Justice ("DOJ") and the
Federal Bureau of Investigation ("FBI") (collectively, "defendants"), seeking disclosure of certain
documents requested by Rosenfeld.  Now before the court are parties' second set of cross-motions
for summary judgment.  Having considered the parties' arguments fully and for the reasons set forth
below, the court enters the following memorandum and order.

BACKGROUND

      An overview of this long-running dispute between the parties, including the specific FOIA
requests at issue, was set forth in detail in this court's August 2008 order.  *See* Docket No. 47
(August 2008 order).

      Rosenfeld is a professional journalist who, over the past 30 years, has extensively researched
and written about the FBI's activities in connection with the University of California during the Cold
War.  Over the course of his career, Rosenfeld has published numerous articles about the FBI's
activities at the University of California during nationally prominent events in the 1950s and 1960s,

United States District Court

For the Northern District of California

including the FBI's political surveillance of University of California students and faculty, and the FBI's attempts to oust Clark Kerr as president of the University.  His articles have been based largely on FBI records acquired through FOIA requests and related litigation.  *See generally* Docket No. 86 (Rosenfeld Third Dec.) ¶ 1.  Rosenfeld is currently writing a book about the FBI's activities in connection with the University of California during the Cold War that expands upon his published articles.  *Id.* ¶ 2.  Rosenfeld claims that the former president Ronald Reagan was an FBI informant and that the FBI played an integral role in supporting Reagan's political career.  Specifically, prior to and upon being elected governor of California in 1966, Reagan focused on campus unrest while maintaining a secret relationship with the FBI as an informant regarding communist activity.  *Id.* ¶¶ 10–12.

The parties cross-moved for summary judgment in 2008.  In its August 2008 order, the court granted in part and denied in part both cross-motions because it found numerous deficiencies in the FBI's submissions.  In response to the August 2008 order, defendants filed numerous declarations addressing the deficiencies.  *See* Docket Nos. 49-52.  The court had sought further detail in four distinct areas.

Firstly, "the court order[ed] defendants to explain, for FBIHQ and *each* field office: (1) the nature and scope of all databases and indices maintained by defendants, including a description of the data contained in the same; (2) which databases and indices were searched in response to Rosenfeld's requests, including case indices, whether within or without CRS; (2) [sic] what terms were searched, or if a different mechanism for searching was used, to explain the same; (3) when the search was performed; (4) where the search was performed; and (5) which databases and indices were not searched and why not."  August 2008 Order at 19.  The FBI's declarant, David M. Hardy, explained the various databases and indices maintained by the FBI.  Docket No. 83 (Hardy Fifth Dec.) ¶¶ 49-55 (Central Records System ("CRS")), ¶¶ 56-60 (Electronic Surveillance).

Secondly, the court ordered that "for FBIHQ and each field office, including technology and record centers, defendants must: (1) explain what databases (that must be searched manually) are located in that office, including a description of the information stored in these databases and an explanation of how the files are organized; (2) list which of these databases were searched; (3) the

United States District Court
For the Northern District of California

mechanics of how they were searched, e.g., by search term; and (4) to the extent that any of these databases were not searched, provide a detailed rationale for this decision." August 2008 Order at 21-22. The FBI explained some of the processes for the manual searches it conducted. Hardy Fifth Dec. ¶¶ 61-62. Each field office maintains independent procedures for how their searches are conducted, but the methods are similar. Docket No. 48 (Hardy Third Dec.) ¶ 13. In all field offices, the index cards are organized so that files can be located by name or by file number. *Id.* Generally, once a potentially responsive file is located, field office personnel review the file for responsiveness based on the information provided in the request letter. *Id.* Information is then sent to FBI headquarters, and if necessary, FBI headquarters can request that the file be forwarded for processing. *Id.*

Thirdly, "[t]he court order[ed] defendants to explain: 1) what records prior to September 27, 1987 would be covered by a search of the automated databases or other databases that must be manually searched; 2) to the extent that pre-1987 records would not be covered by the aforementioned databases, whether they conducted a manual search of the Index cards; and 3) if they did not manually search the Index cards, to provide an explanation for the same." August 2008 order at 22. The Hardy and O'Clair declarations provide background on the abstract card system, which was in effect at the FBI from 1921 to 1979. Docket No. 50 (O'Clair Dec.) ¶¶ 13, 19, 20; Hardy Fifth Dec. ¶¶ 79-84. According to the FBI, it would take an employee about 38 years to complete a hand-search, by subject name, of the approximately 30 million abstract cards stored in 2,000 boxes containing 15,000 cards each. Docket No. 49 (Hardy Fourth Dec.) ¶ 5. Consequently, a review of all abstract cards by subject matter would cost the government almost $1.5 million. *Id.* Most of the storage boxes indicate the case file number and serial scope of the cards. *Id.* It therefore appears to be simpler, less costly, and less time consuming to search the abstract cards by file number. *Id.*

Fourthly, the court held that "[f]or all records identified as lost or destroyed, the court orders defendants to: (1) list the individuals that searched for the lost or destroyed records; and (2) explain the steps taken to retrieve the document." August 2008 order at 24. The FBI explained, in detail, its

United States District Court

For the Northern District of California

1  procedures in declarations submitted subsequent to the court's order.  Hardy Fifth Dec. ¶¶ 93-103;

2  Hardy Fourth Dec. ¶¶ 10-11.

3        The procedural developments in this case since the August 2008 order have been

4  documented in the several case management conference statements filed in the interim.  *See* Docket

5  No. 59 (February 7, 2009 case management statement), 61 (April 6, 2009 case management

6  statement), 65 (June 15, 2009 case management statement), 71 (November 2, 2009 case management

7  statement).  Moreover, the parties, through telephone conferences and correspondence, have made

8  extensive efforts to narrow the disputed issues.  Indeed, over the course of the last three years, the

9  FBI estimates that it "has spent over $211,391 responding to Plaintiff's numerous requests . . . ."

10  Hardy Sixth Dec. ¶ 4.  An exhaustive recitation of the FBI's Herculean efforts at compliance with

11  FOIA obligations are chronicled in their second motion for summary judgment.  Docket No. 82 (FBI

12  Motion).

13

14  LEGAL STANDARD

15        Summary judgment is proper when the pleadings, discovery, and affidavits show that there is

16  "no genuine issue as to any material fact and that the moving party is entitled to judgment as a

17  matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the

18  proceedings.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

19        The court reviews *de novo* an agency's action in response to a FOIA request, and the agency

20  bears the burden of justifying non-disclosure.  *See* 5 U.S.C. § 552(a)(4)(B).  To prevail on summary

21  judgment in a FOIA action, the government must establish that: 1) its search for responsive

22  documents was reasonable; and 2) it has described with reasonable specificity the nature of the

23  responsive documents and its justification for any non-disclosure.  *Zemansky v. United States Envtl.*

24  *Prot. Agency*, 767 F.2d 569, 571 (9th Cir. 1985); *Halpern v. Fed. Bureau of Investigation*, 181 F.3d

25  279, 291 (2d Cir. 1999).

26        FOIA requires that the agency conduct a reasonable search for responsive documents using

27  methods which can reasonably be expected to produce the information requested.  *See* 5 U.S.C.

28

4

United States District Court

For the Northern District of California

1  § 552(a)(3)(c).  In demonstrating the reasonableness of a search, an agency "may rely upon

2  reasonably detailed, nonconclusory affidavits submitted in good faith."  *Zemansky*, 767 F.2d at 571.

3

4  DISCUSSION

5        These cross-motions for summary judgment raise two distinct issues.  Firstly, defendants

6  contend that Rosenfeld's cause of action is moot because they have conducted a search reasonably

7  calculated to uncover all relevant documents.  Rosenfeld disagrees.  Secondly, Rosenfeld contends

8  that the FBI has inappropriately redacted certain information in documents produced in response to

9  his FOIA requests.

10  I.       Reasonableness of the Search

11        Rosenfeld contends that the FBI failed to conduct a reasonable search for the following

12  reasons:  1) failure to provide documents referenced in summary memoranda; 2) failure to explain

13  nature of non-responsive documents; and 3) failure to search every database within the FBI.

14  Rosenfeld also raises, but fails to oppose, three other issues.  Each is discussed in turn.

15        A.       Summary memoranda

16        The FBI's file on Ronald Reagan contains an index card referring the reader to seven

17  different summary memoranda created on five different days.  Docket No. 48 (Hardy Third Dec.),

18  Exh. B, part 2 at 4.  Specifically, the card references summary memoranda dated July 20, 1976,

19  September 28, 1959, March 9, 1965, January 27, 1967, and February 11, 1975.  It directs the reader

20  to "see summary memo dated . . . ." and provides serial numbers for these memoranda.  It is

21  undisputed that on various dates from 1959 to 1976, the FBI created summary memoranda

22  pertaining to Ronald Reagan.

23        Summary pages are documents that "contain references to other files but do not include

24  substantial information concerning the subject matter" in question.  Hardy Sixth Decl. ¶ 5.  They are

25  "located and released when the FBI conducts a normal Central Records Search ("CRS")."  *Id.*  The

26  memoranda list documents in FBI files that were found to contain references to Ronald Reagan.  For

27  example, the cover sheet to the summary memorandum dated March 9, 1965 and listed as record 80-

28  579-3 describes its contents as follows:

United States District Court
For the Northern District of California

1

2

3

> The following is a summary of information obtained from a review of all references subsequent to September 28, 1959 to the subject in the Los Angeles files under the name listed above [Ronald Reagan]. All references under the above name containing data identical or possibly identical with the subject have been included. This summary is designated to furnish a synopsis of the information set in each reference.

4   Ronald Reagan-5204. The summary memorandum then lists records, by file and serial number, and

5   describes the contents of each record. Rosenfeld Third Decl. ¶18 & Exh. I.

6   These summary pages appear to list files that reference the subject in question but are not

7   indexed in CRS under that subject. Hardy Sixth Decl. ¶ 5. Indeed, the FBI agent has discretion to

8   determine whether a file is significantly connected to the subject such that indexing it in CRS would

9   be appropriate. *Id.* Because the agent chose not to index the file in the CRS, the FBI claims that the

10  documents sought by Rosenfeld are irrelevant. Thus, the FBI claims it has no duty to search for

11  records that are otherwise related to the subject as long as those records are not indexed to the

12  subject in the CRS or the manual indices. The FBI agent's decision to index or not to index,

13  however, does not inform the FOIA analysis. The court may not order the FBI to change the way it

14  stores data; however, the fact remains that the non-released records pertain to the subject of the

15  search and specifically inform the reader as to where to find additional information on a certain

16  subject by identifying responsive records.

17  Upon specific identification of responsive documents, the FBI cannot use the make-up of its

18  own internal database as a shield to avoid FOIA mandates. *Weisberg v. U.S. Dep't of Justice*, 745

19  F.2d 1476, 1487 (D.C. Cir. 1984), does not help the FBI. There, unlike here, the requestor could not

20  come forward with evidence to suggest that responsive documents might be found in a particular

21  location. The FBI's other cases all deal with situations in which the existence of additional records

22  was merely inferred or where the agency searched for, but could not locate, referenced records. *See,*

23  *e.g.*, *Steinberg v. Dep't of Justice*, 23 F.3d 548, 552 (D.C. Cir. 1994). Nonetheless, the FBI is

24  correct that documents that have not been provided in response to a FOIA request but happen to be

25  referenced in the produced documents are not necessarily relevant or automatically subject to the

26  original request. *See Lahr v. NTSB*, 569 F.3d 964, 987-88 (9th Cir. 2009) (mere reference is

27  insufficient). Here, however, the FBI is unable to demonstrate that the documents identified in the

28  memoranda are non-existent, outside the scope of the request, or irrelevant.

6

United States District Court

For the Northern District of California

Rosenfeld's FOIA request sought all documents concerning Ronald Reagan that had not been previously released to him.  Docket No. 13 (First Amended Complaint), Exh. EEEE.  Consequently, to the extent the summary memoranda identified above refer to documents related to Reagan that have yet to be released to Rosenfeld, the documents are within the scope of Rosenfeld's request.

Secondly, the documents referenced in the summary memoranda are not irrelevant.  The FBI's declarant testified that "[i]f additional files exist, it is very likely that the record from the CRS will educate the RIDS personnel handling the request of its existence resulting in further searching or notification to the requester that additional information might be available."  Hardy Fifth Dec. ¶54 n.10.  Here, it is undisputed that the summary pages catalog the existence of documents pertaining to Ronald Reagan in particular files that the FBI has refused to search.  Specifically, the summary memoranda list the file and serial numbers, and sometimes page numbers, of the relevant records.

Accordingly, the FBI's failure to search for, let alone produce, specific, identified documents the existence of which are not disputed demonstrates that an adequate search was not performed.  Although the FBI argues that such a search is unduly burdensome, it provides no specifics regarding the burden other than the legal conclusion that such a search would be unduly burdensome.  Hardy Fifth Dec. ¶ 87 ("The FBI maintains that a page-by-page, line-by-line hand search of all files related to the main subject is an unduly burdensome search.").  Rosenfeld does not seek a page-by-page, line-by-line search of the all files related to the main subject, simply the records specifically identified in the summary memoranda.  The FBI must therefore search for, process, and produce responsive records, and only those records, that are specifically identified in the following summary memoranda:  80-579-2, 80-579-3, 80-579-58, 80-579-59, 100-821-136, 100-8120-161 and 116-70463-3.  The FBI need not search for any further summary memoranda.

B.    Documents labeled non-responsive

Rosenfeld contends that in order to meet its burden under the FOIA, the FBI must explain its rationale for finding documents non-responsive.  The FBI states that non-responsive records are those "that the FBI deemed as either pertaining to another individual with the same name, not containing enough information to determine if the named subject was the subject of the request or

7

falling outside the scope of the time frame of the FOIA request."  Hardy Fifth Dec. ¶ 106; Hardy Sixth Dec. ¶10.

The FBI need not produce documents pertaining to another individual with the same name, nor must the FBI produce documents falling outside the scope of the time frame of the FOIA request.  The FBI must, however, produce records that do not contain enough information to determine if the named subject was the subject of the request.  The FBI's current position, one favoring non-disclosure over disclosure, goes against the dictates of the FOIA.  The FOIA favors disclosure.  *See Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) ("Disclosure, not secrecy, is the dominant objective of the Act."); *John Doe Agency v. John Doe Corp.*, 493 U.S. 146 (1989) (finding that the basic policy embodied in FOIA is that agency documents are subject to disclosure unless they fall into one of the nine exemptions enumerated in the statute).  Moreover, these records were retrieved during a search based on plaintiff's request because the FBI had at one point determined that the record was relevant to the search terms.  It strains credulity for the FBI to now argue that its agents index records to a search term even if the record bears no reference to the indexed search term.  Hardy Fifth Dec. ¶¶ 106-7.

Unfortunately, at the time of the original document processing, the FBI did not distinguish between the three categories of non-responsive files.  As a result, in order to release the files the FBI incorrectly determined were non-responsive, the FBI will have to reprocess the entire pool of documents which it labeled as non-responsive.  The court recognizes that the additional burden and costs imposed by such reprocessing is not trivial.  Accordingly, the court orders defendant to reprocess thirty (30) random files labeled non-responsive and release the files it withheld because it had insufficient information to definitively determine that the file was responsive.  The parties are ordered to meet and confer regarding the universe of files from which the thirty non-responsive files are to be randomly selected, e.g., whether the files found non-responsive from the Neil Reagan search should be included in the universe of non-responsive files from which the thirty files will be chosen.

United States District Court

For the Northern District of California

C.   Adequacy of search

Rosenfeld contends that the FBI has failed to explain how it determined that the records sought were unlikely to be found in indexes or databases not included in the CRS or Electronic Surveillance ("ELSUR") systems.  He claims that the FBI has made a blanket decision that, with respect to FOIA requests, responsive records do not exist outside the CRS or ELSUR. Consequently, Rosenfeld seeks to compel the FBI to search *all* record systems for responsive records.  Such an expansive search is not necessary to meet FOIA requirements.

It is undisputed that the FBI remains unable or unwilling to confirm that *all* its records systems were searched for responsive records.  Instead, the FBI claims that the CRS and the ELSUR "are the two [automated search] systems where responsive records were likely to be found in regard to plaintiff's FOIA requests."  Hardy Fifth Dec. ¶ 48.  Specifically, the FBI field offices conducted a search of the CRS, the confidential indices, the manual indices, and the ELSUR.  *Id.* ¶ 77.  The FBI declined to search additional databases listed on the search slips because they contained information solely related to drug and gang-related activities, which the FBI found to be irrelevant to Rosenfeld's requests.  *Id.* (listing the following databases:  DRUG X, Telephone Application, Criminal Law Enforcement Application, Integration Intelligence Information Application, and Criminal Intelligence Support Program).

"There is no requirement that an agency search every record system" in its attempt to locate the requested files.  *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).  Specifically, it is not necessary for an agency to engage in a vain search where it believes responsive documents are unlikely to be located.  *See Marks v. U.S. Dep't of Justice*, 578 F.2d 261, 263 (9th Cir. 1978) (searching all field offices and every division was not necessary when the agency knew where responsive documents were likely to exist).  The FBI searched those electronic databases that were most likely to contain responsive documents, mainly the CSR and ELSUR systems.  Hardy Sixth Dec. ¶ 11.  It also searched documents maintained by certain field offices, which search included reviewing a repository of digitized manual indices as well as hand searching manual indices.  *Id.* ¶¶ 15-16.

9

Rosenfeld argues that the FBI must explain its determination that the remaining records systems are not likely to identify responsive records.  FOIA mandates that the FBI need only demonstrate that it searched all records systems that are likely to turn up the information requested, *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998), and does not mandate that the producing agency exhaustively prove that databases that were not searched do not contain responsive documents.  However, "[w]here the agency's responses raise serious doubts as to the completeness of the search or are for some other reason unsatisfactory, summary judgment in the government's favor would usually be inappropriate."  *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982).

While the FBI's decision to stop its search for responsive files prior to the search of every database in its possession does not render their search unreasonable, the FBI must provide some basis for the court to evaluate whether its decision to not search additional databases was reasonable.  Accordingly, within thirty (30) days of the date of this order, defendants are to supply a declaration listing any database which may contain responsive records that the FBI did not search.  The FBI is also to explain the burden and expense of searching such databases.

      D.    <u>Remaining issues</u>

Three issues remain.  Firstly, Rosenfeld again contends that Hardy is an inadequate declarant.  The court has already found Hardy to be an adequate declarant.  August 2008 Order at 16-17.  Moreover, the court's prior concern regarding Hardy's personal knowledge has been addressed.  In addition to supervising FOIA searches, Hardy personally reviewed search notes, search slips, and other documentation regarding search results generated by FBI headquarters as well as the field offices in response to Rosenfeld's requests.  Hardy Fifth Dec. ¶¶ 3-9.

Secondly, Rosenfeld contends that the FBI must produce a destruction log for a file regarding an antitrust investigation that concerned the Music Corporation of America.  This issue is moot as the FBI has produced an undated document which lists the file on a destruction log.  Hardy Sixth Decl. ¶ 7; *see id.*, Exh. A (Destruction Log).

Thirdly, Rosenfeld seeks documents stored in the "special file room." However, all files contained within this room are indexed within the CRS and manual search index cards. *Id.* ¶ 18. As a result, documents stored in the "special file room" have been searched. *Id.* ¶ 19.

## II.    FOIA exemptions

Rosenfeld contends that defendants have inappropriately redacted or withheld information from release. In particular, Rosenfeld claims that: 1) defendants have failed to abide by the standard for the release agreed upon in the 1996 settlement agreement; 2) all documents not included in the representative *Vaughn* index should be reprocessed given the high rate of error within the *Vaughn* index; 3) defendants have inappropriately asserted the law enforcement exemption under 5 U.S.C. section 552(b)(7)(3); 4) defendants have inappropriately asserted the tax return exemption under 5 U.S.C. section 552(b)(3); and 5) defendants have inappropriately asserted the privacy exemption under 5 U.S.C. section 552(b)(6). Each argument is addressed in turn.

### A.    1996 settlement agreement

Rosenfeld contends that during settlement negotiations with respect to this action, the parties agreed that all records produced in response to the instant FOIA requests would be processed using the standards set forth in paragraph two of the 1996 settlement agreement ("the 1996 agreement"). Docket No. 13 (Amended Comp.), Exh. B (1996 Agreement) ¶ 2. The 1996 agreement, however, confines its application to Rosenfeld's FOIA requests in two previous cases. *Id.* ¶ 1 (limiting its application to *Rosenfeld v. U.S. Dep't of Justice*, 761 F. Supp. 1440 (N.D. Cal. 1991) (Patel, J.) (*Rosenfeld I*), *aff'd in part and rev'd in part,* 57 F.3d 803 (9th Cir. 1995), and *Rosenfeld v. U.S. Dep't of Justice*, No. C-90-3576 (N.D. Cal.) (Patel, J.) (*Rosenfeld II*)). As part of the 1996 agreement, parties agreed that Rosenfeld's FOIA requests concerning Reagan would be "deemed a separate matter not covered by this agreement and shall not be considered part of the *Rosenfeld I* and *Rosenfeld II* cases." *Id.* ¶ 9. The agreement also makes clear that "the terms of [the] agreement do *not* establish any general policy and shall have no precedential or binding effect beyond the scope of this specific agreement." *Id.* ¶ 11 (emphasis in original).

Rosenfeld contends that it was his understanding that, in exchange for narrowing his request for documents, the FBI would agree to process the requested documents under the release standards

United States District Court

For the Northern District of California

set forth in the 1996 agreement. Rosenfeld Third Dec. ¶ 8; Rosenfeld Fourth Dec. ¶ 8. Such a belief is reasonable, since it appears that many of the documents in the representative *Vaughn* index were processed in accordance with the 1996 agreement. *See e.g.*, Hardy Fifth Dec., Exh. WW (*Vaughn* index) at Ronald Reagan-5178, 5196, 5211, 5213, 5253, 303, 494, 748. Defendants contend, however, that no such agreement was reached and that any disclosures in accordance with the 1996 agreement were made under the administrative discretion of the FBI. Hardy Sixth Dec. ¶ 21. Accordingly, defendants argue that they were under no obligation to abide by the 1996 agreement.

In light of the 1996 agreement's explicit limiting terms, Rosenfeld's bare and self-serving allegations are insufficient to require the FBI to reprocess the records at issue here in accordance with that agreement. Moreover, the FBI's release of merely some, but not all, information in accordance with the 1996 agreement demonstrates that it was exercising its administrative discretion, and does not lead to a waiver. Accordingly, the 1996 agreement does not apply to the instant FOIA requests.

B.      Reprocessing records

Rosenfeld seeks reprocessing of all responsive records because he claims the high rate of error in the sample *Vaughn* index calls into question the validity of exemptions claimed in the non-sampled records. As in many FOIA cases with large disclosures, the parties agreed that the FBI would prepare a representative sample *Vaughn* index for documents identified by Rosenfeld rather than provide a narrative explanation for every exemption claimed. Rosenfeld contends that the 150 deletions that were rescinded upon reprocessing of 119 pages represents a 31% error rate based on the 486 deletions originally claimed. Rosenfeld claims this high rate of error mandates reprocessing of the whole production.

Upon reprocessing, defendants rescinded 32 instances of originally withheld information based on the 1996 settlement agreement. Hardy Sixth Dec. ¶ 21. Since that agreement does not apply, those rescissions were not errors. Defendants further assert that the disclosures subsequent to reprocessing were based on administrative discretion, not error correction. They do not explain why administrative discretion was exercised upon reprocessing the sample, but not during the original release.

The D.C. Circuit discussed this issue in *Meeropol v. Meese*, 790 F.2d 942 (D.C. Cir. 1986). The *Meeropol* court ordered the FBI to reprocess documents withheld under claims of exemption because of an unacceptably high error rate in the reprocessing of a small subset of withheld documents. *Id.* at 959-60. Of the 75 documents reprocessed, the FBI found 19 of them to have information which should have been disclosed when first produced, resulting in a error rate of 25%. *Id.* The court found that, "[w]hen coupled with the finding by the district court that the FBI had been 'intransigent' in 1975, [the] error rate [was] unacceptably high, and suggest[ed] . . . that many of the documents processed in 1975 were improperly withheld." *Id.* at 960.

Here, defendants have already agreed to reprocess documents contained in both the Ronald Wilson Reagan and SAG files. These files contain approximately half of the errors identified by Rosenfeld. Given the FBI's decision to voluntarily reprocess the majority of the records, no further reprocessing is necessary at this time. *See* Docket No. 97 (Transcript) at 4:16-5:1 (at oral argument, Rosenfeld stated that the FBI has agreed to voluntarily reprocess six to eight thousand pages of the eleven thousand pages produced).

C.      Law enforcement exemption

Defendants claim certain information is exempt from disclosure for law enforcement purposes under 5 U.S.C. section 552(b)(7)(C). FOIA mandates a policy of broad disclosure when the production of documents is properly requested. 5 U.S.C. § 552(a); *Dep't of the Air Force v. Rose*, 425 U.S. 352, 360-61 (1976). However, it also provides nine exemptions from the statute's broad reach. 5 U.S.C. § 552(b)(1)-(9). Exemption seven lists numerous instances where an agency may exempt from disclosure information compiled for legitimate law enforcement purposes. *Id.* § 552(b)(7). Under exemption 7(c), an agency may withhold from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C).

The government bears the burden of demonstrating that a given document can be withheld under an exemption. *Id.* § 552(a)(4)(B). In order to claim a section 7 exemption, an agency must first establish that the information withheld was compiled for legitimate law enforcement purposes.

13

United States District Court

For the Northern District of California

The agency must then establish that disclosure could reasonably be expected to constitute an unwarranted invasion of privacy. An invasion of privacy is unwarranted if the privacy interests of the individuals protected by the non-disclosure is greater than the public interest at stake. *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 762 (1989); *Rosenfeld v. U.S. Dep't of Justice*, 57 F.3d 803, 811 (9th Cir. 1995). Each prong is discussed in turn.

### 1. Legitimate law enforcement purpose

The Federal Bureau of Investigation has a clear law enforcement mandate. *Binion v. Dep't of Justice*, 695 F.2d 1189, 1194 (9th Cir. 1983). Because of this mandate, the government "need only establish a 'rational nexus' between enforcement of a federal law and the document for which [a law enforcement] exemption is claimed." *Church of Scientology*, 611 F.2d at 748.

The rational nexus test requires a degree of deference to a law enforcement agency's decisions to investigate. *Pratt v. Webster*, 673 F.2d 408, 421 (D.C. Cir.1982). However, the court need not accept the government's claim that a previous investigation had a legitimate law enforcement purpose if the asserted purpose is "pretextual or wholly unbelievable." *Id.* "[T]he FBI must establish that its investigative activities are 'realistically based on a legitimate concern that federal laws have been or may be violated or that national security may be breached.'" *Powell v. U.S. Dep't of Justice*, 584 F. Supp. 1508, 1522 (N.D. Cal. 1984) (Patel, J.) (quoting *Pratt*, 673 F.2d at 420-21). If an agency "was merely monitoring the subject for purposes unrelated to enforcement of federal law," a threshold showing has not been made. *Lamont v. Dep't of Justice*, 475 F. Supp. 761, 773 (S.D.N.Y. 1979); *but cf. Curran v. Dep't of Justice*, 813 F.2d 473, 475 (1st Cir.1987) ("'investigatory records of law enforcement agencies are inherently records compiled for 'law enforcement purposes' within the meaning of Exemption 7.'" (quoting *Irons v. Bell*, 596 F.2d 468, 475 (1st Cir. 1979))). In other circumstances, the court should not "second-guess a law enforcement agency's decision to investigate if there is a plausible basis for the decision." *Pratt*, 673 F.2d at 421.

Rosenfeld argues that records detailing the FBI's involvement with Reagan's political career, information about the involvement of members of the motion picture and entertainment industries with the Communist Party, and all information contained in "80" files and "100" files were not compiled for legitimate law enforcement purposes. In response, the FBI broadly contends that all

14

such documents satisfy the "rational nexus" test because they relate to the FBI's investigation of the Communist Party, other extremist activities, and threats to assassinate Reagan in San Jose, California on November 8, 1966.  Hardy Fifth Dec. ¶ 149; Hardy Sixth Dec. ¶ 23.  Each is discussed in turn.

i.     <u>Reagan's political career</u>

Information regarding acts taken to protect or promote Reagan's political career, or acts done as political favors to Reagan serve no legitimate law enforcement purpose.  Such activities fall outside of the FBI's statutory mandate and therefore could not have been undertaken for legitimate law enforcement investigations.

Rosenfeld points to only one example of the defendants' attempts to withhold information involving the FBI's involvement in Reagan's political career.  Ronald Reagan-5209-5210.  This example details the FBI's attempts to notify Reagan about the association between an individual whom Reagan knew and the son of a known figure in organized crime.  *Id.* at Ronald Reagan-5210.  The FBI advised Reagan of this association, to which Reagan responded that association "might well jeopardize any political aspirations [Reagan] might have."  *Id.*  Reagan agreed to contact his acquaintance and "instruct him to dis-associate himself gracefully and in a manner which would cause no trouble or speculation."  *Id.*  The FBI redacted the name of Reagan's acquaintance.  *Id.*  There is no evidence that the redacted individual was involved in nefarious activity; instead, it appears that the FBI sought Reagan's help to have the redacted individual distance himself from the son of the known figure in organized crime.  Consequently, since there exists no rational nexus between this information and a legitimate law enforcement purpose, it must be released.

ii.     <u>Communist investigation</u>

The Supreme Court has established that the Smith Act and analogous laws allowed prosecution of only active members of the Communist party with specific intent to advocate the forcible overthrow of the United States Government.  *Yates v. United States*, 354 U.S. 298 (1957); *see Rosenfeld v. United States Dep't of Justice*, 761 F. Supp. 1440, 1458 (N.D. Cal. 1991) (Patel, J.); *Lamont v. Dep't of Justice*, 475 F. Supp. 761, 776-75 (S.D.N.Y. 1979).  Consequently, Rosenfeld contends that there is no rational nexus between compiling information about an individual's mere

United States District Court

For the Northern District of California

membership in, or association with, the Communist Party or other subversive group and a legitimate law enforcement purpose.  *See* MPIC-22-23, 26, 29.

Defendants assert, in conclusory terms, that information concerning an individual's membership in the Communist party and other subversive organizations was collected for a legitimate law enforcement purpose.  Hardy Sixth Dec. ¶ 23 ("At the time the FBI conducted its investigations, there were valid federal statutes authorizing these investigations of individuals. There was a law enforcement purpose to the investigations.  Whether or not these investigations proved fruitful is not the issue; the files related to those investigations were properly indexed at that time as investigatory files and, therefore, satisfy the Exemption 7 threshold standard.").  Defendants rest their legitimate law enforcement purpose on the "threat of global domination by communism" and the fact that "the peace/anti-war movement of the 1960s included individuals and organizations who were suspected threats to national security and who also may have been involved in the planning and execution of unlawful disruptive activities."  *Id.*

While the investigation of specific individuals who advocated for the violent overthrow of the government may be conducted with a legitimate law enforcement purpose, an individual's mere association with the Communist Party may not.  *See Rosenfeld*, 761 F. Supp. at 1458; *Lamont*, 475 F. Supp. at 774-75 & nn.56, 57.  Thus, for all documents dated post-1957, the investigation of an individual's mere membership in, or association with, the Communist Party or other purportedly subversive political movement, is not by itself a legitimate law enforcement purpose.

MPIC-22, 23, and 26 are from an FBI memorandum dated March 20, 1974 regarding concerns of a retired admiral that the movie "Seven Days in May" is "critical of the military establishment and is detrimental to the Nation."  MPIC-23.  MPIC-22 specifies that the redacted individual "is [sic] pacifist who favors disarmament and opposes conscription."  MPIC-23 redacts the name of a correspondent who spoke with the retired admiral regarding books and movies that disparage the Pentagon.  There is no indication that the correspondent was a member of the Communist party or other subversive organization.  The redactions on MPIC-26 pertain to the name of a person involved in the making of "Seven Days in May."  Compilation of this information does not have a legitimate law enforcement purpose for the same reasons as mere association with the

16

United States District Court

For the Northern District of California

Community Party does not.  Moreover, the redacted individual in MPIC-26 is referred to as "anticommunist."  Finally, MPIC-29 redacts the name of an actor from an "all-Negro cast" that "has been identified by a reliable source as a member of the Communist Party in 1963."  This redacted name does not appear to be associated with violent overthrow of the government.  Consequently, the individuals discussed above, whose names were redacted in MPIC-22, 23, 26, and 29, must be disclosed.

iii.     "80" and "100" files

Rosenfeld argues that information compiled in "80" and "100" files are categorically excluded from protection under exemption (7)(c) because by their very nature, these records were not compiled for legitimate law enforcement purposes.  He claims that "80" files are public relations files created for political, non-law enforcement purposes, and that "100" files are political in nature and compiled to collect information on the activities of "left-liberal" organizations that the FBI labeled subversive and not in accordance with its law enforcement authority.  Defendants contend that these files are compiled in accordance with the FBI's law enforcement duties as authorized by law.  Hardy Sixth Dec. ¶ 23.  However, defendants have failed to articulate the nature of "80" and "100" files and specify why information was compiled into these files.  Defendants simply state in a conclusory and generalized manner that "the FBI has established a rational nexus between investigations and the FBI's law enforcement duties as authorized by federal statute."  Hardy Sixth Dec. ¶ 23.

Ronald Reagan-5162 is a summary memorandum regarding Reagan.  Paragraphs six and seven discuss an individual who received blank United States commissions and asked the informant if the informant wanted a commission.  This individual may have provided a commission to Reagan.  Ronald Reagan-5163.  Although this document may pertain to the FBI's duty to investigate fraud against the government, it does not relate to its stated rationale:  Communist Party membership, other extremist activities or threats to assassinate Reagan.  Hardy Fifth Dec. ¶ 149; Hardy Sixth Dec. ¶ 23. Similarly, in Ronald Reagan 449-50, which is a memorandum from October 27, 1967 entitled "Governor Ronald Reagan (Homosexuals on staff)," the FBI redacted the names of state employees that were investigating allegations that people on then-Governor Reagan's staff were homosexual.

17

United States District Court

For the Northern District of California

The identity of these employees also does not pertain to the FBI's stated rationale.  Moreover, the memorandum does not appear to be for legitimate law enforcement purposes, and specifically concedes that "this was not a matter within the investigative jurisdiction of the FBI . . . ."  Ronald Reagan-450.

Accordingly, for Ronald Reagan-5162, 5163, 449-50, defendants have failed to make a threshold showing that those files were compiled for legitimate law enforcement purposes and the redacted information discussed above must be disclosed.  Although the government has failed to meet the threshold requirement with respect to the specific documents discussed above, this failure cannot be extrapolated to all "80" and "100" files.  Consequently, it would be premature to categorically conclude that all information contained within the "80" and "100" files cannot meet this exemption.

2.      Balancing privacy interests

Since the government has failed to meet its threshold burden with respect to the withholdings challenged by Rosenfeld, the court need not balance the privacy interests at issue.

D.      Tax return exemption

FOIA section (b)(3) allows an agency to withhold information "specifically exempt from disclosure by statute."  5 U.S.C. § 552(b)(3)(A)(I)-(II).  Defendants claim to have withheld third-party tax information in accordance with 26 U.S.C. section 6103, which both parties agree prohibits the release of "tax return information" and can provide a basis for exemption from disclosure.  Rosenfeld, however, argues that defendants have failed to sufficiently demonstrate that the withheld information fits within the requirements of 26 U.S.C. section 6103.

Section 6103 of the Internal Revenue Code provides that "no officer of the United States . . . shall disclose any return information obtained by him in any manner in connection with his service."  26 U.S.C. § 6103(a)(1).  The statute defines "return information" as

> a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any

18

United States District Court

For the Northern District of California

person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense.

*Id.* § 6103(b)(2)(A).

In order to carry its burden, the government may provide affidavits with reasonably detailed descriptions of the documents and allege facts sufficient to establish an exemption. *Kamman v. U.S. Internal Revenue Serv.*, 56 F.3d 46, 48 (9th Cir. 1995). Defendants claim that the information was properly exempted at the request of the Internal Revenue Service ("IRS") because the "information was collected by the IRS with respect to tax return and personal information of third parties." Hardy Sixth Dec. ¶ 26. The entirety of defendants' support is this conclusory statement. Although the government references an IRS response received September 17, 2009, they fail to attach or describe the rationale behind the IRS' response. *See id.*

Accordingly, within thirty (30) days of the date of this order, the FBI shall supply a declaration with sufficient detail to determine whether the IRS has appropriately directed the FBI to withhold information contained in Ronald Reagan-370-71, 1407, 1552, 1570. Therefore, with respect to Ronald Reagan-370-71 and 1407, the court does not reach the propriety of exemptions (6) and (7)(c) regarding identifying information.

E.      Privacy exemption

FOIA exemption six exempts "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Names and other identifying information are subject to FOIA exemption six. Specifically, "[b]ecause each piece of information withheld by the FBI applies to specific individuals, the FBI has met the threshold requirement for Exemption 6 protection." *Voinche v. Fed. Bureau of Investigation*, 412 F. Supp. 2d 60, 67 (D.D.C. 2006). The private and public interests at issue must therefore be balanced.

Rosenfeld contends that the public value of disclosure of deceased persons, exposed sources, and persons for whom Rosenfeld has submitted waivers always outweighs those individuals' privacy interests. The court agrees. Rosenfeld also contends that public figures and public officials have diminished privacy interests such that the balance is tipped in favor of disclosure. Although

United States District Court

For the Northern District of California

Rosenfeld is correct that public figures and officials have diminished privacy interests, the court cannot find, *a fortiori*, that the individual's identity must be disclosed. Given the individualized nature of the balancing inquiry and the varying privacy interests of the individuals involved, the court cannot make a categorical determination that the identify of all public officials and figures mentioned within the responsive documents should be disclosed. However, the court notes that persons who have placed themselves in the public light, e.g., through politics, or voluntarily participate in the public arena have a significantly diminished privacy interest than others. Thus, in most instances a public official's or public figure's privacy interests will be outweighed by the public interest in disclosure.

The court now turns to the particular redactions at issue here. As discussed above, MPIC-22, 23, and 26 are from an FBI memorandum dated March 20, 1974 regarding concerns of a retired admiral that the movie "Seven Days in May" is "critical of the military establishment and is detrimental to the Nation." MPIC-23. All of the individuals mentioned in these documents maintain a privacy interest; however, this privacy interest is significantly diminished due to the passage of time, as well as the lack of contact information regarding these individuals. Moreover, many of these people thrust themselves into the public arena. Therefore, disclosure would not "constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). In any event, the privacy interest is outweighed by the public interest in disclosure. Specifically, these names will shed light on the extent to which the FBI investigated so-called unpatriotic works of art and charges of communism. The disclosure will thus "shed light on [the FBI's] performance of its statutory duties or otherwise let citizens know what their government is up to." *Bibles v. Or. Natural Desert Ass'n*, 519 U.S. 355, 355-56 (1997) (per curiam).

This rationale applies equally as forcefully to the FBI's attempts to elicit Reagan's help to have a redacted individual distance himself from the son of a known figure in organized crime. Ronald Reagan-5209-5210. The public maintains a significant interest in knowing the extent of the FBI's involvement in furthering Reagan's political aspirations by informing him of individuals that may jeopardize his career. The identity of the individual possessing blank United States commissions who may have provided a commission to Reagan must be disclosed for the same

**United States District Court**
For the Northern District of California

1  reasons.  Ronald Reagan-5162-63.  The privacy interest of the target of a 1944 investigation is

2  essentially non-existent because the statute of limitations for the fraud charge has long passed.

3  Indeed, it is unclear whether the target is still alive.  Moreover, this information will shed light on

4  how the FBI conducted its operations with respect to people with whom the agency associated,

5  namely Reagan.  Finally, with respect to the October 27, 1967 memorandum entitled "Governor

6  Ronald Reagan (Homosexuals on staff)," the identity of the employees that investigated allegations

7  regarding homosexuals in Reagan's staff must also be disclosed because the identities will help the

8  public understand the extent of agency wrongdoing, if any, associated with preparing documents for

9  Reagan that were "not a matter within the investigative jurisdiction of the FBI . . . ."  Ronald

10  Reagan-450.

11

12  CONCLUSION

13       For the foregoing reasons, the cross-motions are GRANTED in part and DENIED in part.

14  IT IS SO ORDERED.

15

16  Dated: August 31, 2010                          _____

17                                                  MARILYN HALL PATEL
                                                    United States District Court Judge
                                                    Northern District of California

18

19

20

21

22

23

24

25

26

27

28

21